No. 20906.

ROOSEVELT WATKINS *v.* THE PEOPLE OF THE
STATE OF COLORADO.
(408 P.2d 425)

Decided December 6, 1965. Rehearing denied December 27, 1965.

486

RICHARD J. BERNICK, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, JOHN E. BUSH, JOHN P. MOORE, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

THE plaintiff in error, defendant in a criminal case in the Denver District Court, will be referred to by name or as defendant.

He was found guilty by a jury of second degree murder, and to a judgment of conviction and a sentence of thirty to forty years in the state penitentiary he brings writ of error. In the summary of argument he cites as error the giving of certain instructions by the court, the refusal to give certain other instructions tendered by him, and the admission of evidence in two particulars.

For an understanding of Watkins' chief assignments of error directed to the instructions given to the jury, a recital of the evidence in greater detail than is customary is deemed necessary including evidence of a course of relevant behavior by Watkins beginning earlier in the day on which the homicide was committed. This is because Watkins' defense is an unusual one — that he was suffering from traumatic amnesia. That he committed the offense is not denied. In fact, there were a number of eye witnesses to establish it. He disclaims, however, any knowledge of the crime.

On Saturday, December 3, 1960, Watkins, who had been paid on the previous day, started the subsequent fateful day in mid-morning in the company of two friends. After purchasing a fifth of liquor, the three

companions went to the residence of one of them and amongst the three the full bottle of spirits was consumed. After that convivial session Watkins went to an establishment in the same section of the city where he commenced gambling and drinking more whiskey. He remained on there until about one thirty or two o'clock in the afternoon. Pocketing his winnings, he then proceeded to the 715 Club. This particular situs was later to be the scene of the crime. The purpose of this first visit to the Club was to pay a debt he owed to one "Chef" who had given food to the defendant on credit. "Chef" was not there, but Watkins met one Hardin and (quoting Watkins' own words) "then began to feel what I was drinking so I gave him some money [$40] to keep for me."

Upon leaving the 715 Club, Watkins again met some friends and returned with them to the place where he had previously gambled. There his drinking and winnings continued apace until late in the afternoon. Just prior to leaving the game and the premises, someone sold Watkins a gun for a price somewhere between six and ten dollars in order to have funds with which to "get in" the game. Watkins placed the gun in his belt and then left for home. He slept approximately one half hour, and then about 7 P.M. departed for a bar located next door to the 715 Club. There he watched a televised boxing match while imbibing beer and more whiskey. When the match was over, some time before nine o'clock in the evening, he returned to the 715 Club. There he had one or two more glasses of beer. Presumably for the purpose of again attempting to contact "Chef," Watkins walked to the kitchen. At that point he was observed by one James Stripling, a porter at the Club, who noticed his hand going through a dutch door in the direction of the steam table. Stripling, on seeing this, cautioned, "You can't take nothing." Another employee, a woman, approached the area and heard Watkins say that he didn't want anything, that he was just

"playing." Stripling, in the meantime, had come out of the kitchen and entered the bar, where he replaced some trash cans behind the bar. About that time Watkins was heard to say, "I am going to kill that son of a bitch." Just as Stripling was about to return from behind the bar, he was approached by Watkins who was on the customer's side. Watkins pointed the gun close to Stripling's head and announced that if he didn't apologize he was going to kill him. A witness testified that his language was "Take it back or I will blow your damn brains out."

At that point the decedent, Marvin Hawkins, the Club bartender, had his attention drawn to the "encounter" between Stripling and Watkins. He came near the two of them and inquired as to what was going on. Watkins repeated his threat, and Hawkins on hearing it took a blackjack from a concealed place behind the bar and dealt him a blow on the head. Watkins was not knocked off his feet, but instead (in the words of an eye witness) "just turned the gun around and shot Mr. Hawkins" between the eyes, killing him instantly.

At the trial Watkins took the stand in his own behalf. He testified that he did not know that the gun he had purchased and was carrying with him was loaded. He said he had no recollection of the threat he had made to Stripling or of his shooting Hawkins. Under cross examination, upon being asked whether he had killed Marvin Hawkins, the defendant replied, "No, sir." Questioned as to how he knew he did not kill Hawkins, he said, "Well, sir, I am of a religious belief, and I know if I had killed a man I would know it. And I definite [sic] didn't kill him."

It was the theory of the defense — a view supported by the expert testimony of a Dr. Manns — that "a blow on the head, as the witnesses testified was suffered by him [Watkins] will cause traumatic amnesia, one of the consequences or results of which will wipe out one segment of a man's memory, or will render his thinking

and reasoning abilities [sic] to the point that he cannot function as a normal human being." Dr. Manns gave an opinion that the blow which Watkins had received on the head, coupled with the drinking, "might have caused his memory to be selectively blocked out, as it appeared was the case from Watkins' testimony, and could have put him in a state of traumatic amnesia which would render him wholly incapable of forming criminal intent or being able to understand the nature or probable result of his act." Alternatively, it was argued by the defense that Watkins acted under intoxication, in self-defense or as a result of provocation.

The trial court instructed the jury, *inter alia,* with reference to the offenses of first and second degree murder, voluntary and involuntary manslaughter, and also pertaining to justifiable homicide. In addition, instructions were also given the jury concerning the character of traumatic amnesia and self defense, together with an instruction limiting their effect when the accused himself initiates the affray.

█ Watkins' first assignment of error concerns the trial court's instruction on the nature and effect of traumatic amnesia. The court's instruction was as follows:

"The Court instructs you that traumatic amnesia, or shock, as used in these instructions, refers to that condition or result of the defendant, Roosevelt Watkins, of being in such a dazed, confused, semi-conscious or unconscious condition and state of mind as to be wholly incapable of forming the necessary criminal intent to commit the crime charged, or of knowing or understanding the nature or probable result of his acts; and if you find that at the time of the alleged homicide the defendant was in such condition, then, your verdict must be Not Guilty as to First Degree Murder."

The defendant objected to limiting the instruction to First Degree Murder and tendered an instruction requiring the jury to find Watkins not guilty of either first and second degree murder if they found that he

was suffering from traumatic amnesia at the time of the criminal act. In his motion for a new trial, defendant suggested that a proper instruction should even exonerate him from voluntary manslaughter as well. In his writ of error defendant maintains that a proper instruction should have been given directing the jury that one suffering from the effects of traumatic amnesia could not be criminally liable at all. We do not agree with the defendant's contentions. The instruction as to traumatic amnesia — under the circumstances in this case — was properly limited to first degree murder; and the evidence, even under the defendant's theory, also supports a conviction of second degree murder.

It is beyond dispute that the physical blow inflicted upon Watkins, the effect of which he predicates his claim of traumatic amnesia, was the direct outgrowth of the assault he was making upon Stripling. No evidence exists in the record which would tend to support any other thesis. Similarly, no evidence was presented which would tend to break the causal connection between the defendant's assault upon Stripling and the blow inflicted upon the defendant's head by Hawkins in coming to Stripling's aid.

The crucial question posed for our determination is: May one who has thus precipitated a fracas and as a result has been hit on the head and rendered semiconscious or unconscious, maintain that he is not criminally responsible for any degree of homicide above involuntary manslaughter, or that he is not criminally responsible at all? We hold that what occurred here after the blow falls well within the orbit of what might have been expected to happen under the circumstances. One could well anticipate that a person assaulted with a deadly weapon might himself render such a blow or otherwise act in such a manner as to cause the gun to go off. One could also anticipate that a third person might come to the rescue of the victim with the same result. We can see no essential difference had Stripling

rendered the blow and had been the one killed instead of Hawkins.

The case of *State v. Coyle*, 86 S.C. 81, 67 S.E. 24, is very similar to the one at bar, and the reasoning therein quite apropos. In that case the defendant had initiated a fight with his victim, menacingly holding out a knife. He lunged at his victim with his knife open, whereupon the person being attacked knocked the aggressor down with a stick. The aggressor got up and pursued his victim, stabbing him in the side and back about ten times. Although there was no homicide involved, the defendant was convicted under the statutes of South Carolina of an assault and battery of a high and aggravated nature. One of the theories of his defense was "insanity at the time of the commission of the offense" which was permissible under the general plea of not guilty at that early time in South Carolina. He claimed head injuries arising out of the blow from the stick. His testimony was interestingly similar to that of the defendant in the case at bar, to-wit: "After he knocked me down, I couldn't tell what happened. He knocked me crazy. I couldn't give account of anything after he hit me with the stick. I will be honest, before God in heaven, he knocked me so crazy I didn't know anything. I don't know what I did * * * I did not know whether I cut him or not."

The lower court in *State v. Coyle, supra,* "charged" the jury as to this defense: "Of course if he was at fault and brought on a difficulty, forced the man to protect himself from the loss of his life or serious bodily harm, to strike him, and as a result of that blow rightfully inflicted by the other man, and wrongfully brought upon himself by his own conduct, he became deprived of his reason and went on and cut or killed the man, of course the law would hold him responsible for what he did, even although he did not then know what he was doing, because he would have been in the wrong in bringing himself into that condition." The defendant

challenged the instruction and contended that it did not matter whether "the mind be destroyed by the acts and doings of the accused or by the touch of the finger of God," if the fact of insanity existed at the time of the offense. In that case the Supreme Court of South Carolina rejected the defendant's argument and approved the charge in question saying:

" 'Insanity' arising during the progress of a difficulty voluntarily brought on by defendant and as the result of a blow rightfully inflicted by his adversary, should not constitute excuse for his after conduct in such difficulty."

With the qualification that under our definition of first degree murder, C.R.S. 1963, 40-2-1 to 3 (1), the "after conduct" would excuse one from first degree murder, we find the reasoning in the South Carolina case persuasive and accordingly we hold that the trial court in the instant case properly instructed the jury to limit the amnesia theory to first degree murder.

 Under our statutes, other than in the commission of a felony, in order to make out first degree murder, there is the requirement of a wilful, deliberate and premeditated killing, i.e., there must be express malice. Express malice has been defined as "that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof." C.R.S. 1963, 40-2-2. It follows that first degree murder can never be committed by one who is incapable of bearing such malice, such as one truly suffering from traumatic amnesia. Watkins had made several threats, but he was still talking and had not as yet made the deliberate move of pulling the trigger. However, as to the evidence supporting second degree murder, Watkins, before the blow, had manifested wanton conduct bent on mischief and without any considerable provocation with all of the circumstances showing an abandoned and malignant heart. These are elements which supplied implied malice which

is all that is necessary for murder in the second degree.

The defendant relies heavily upon *Read v. People,* 119 Colo. 506, 205 P.2d 233. Although traumatic amnesia was the defense in the Read case and the instruction given in the case at bar was taken almost verbatim from the Read case, two additional factors were not present in the case at bar: (1) the alleged amnesia with which the defendant Read claimed to be afflicted was not brought on by her own misconduct, and (2) the error pointed up in that case was the refusal by the trial court to give any instructions on other lesser degrees of homicide below second degree murder. In this case the court did instruct the jury on not only second degree murder, but voluntary and involuntary manslaughter, and the jury could have, from the evidence, returned any of those verdicts.

██ A second assignment of error deals with Watkins' asserted defense of drunkenness and the instruction thereon. On the issue of voluntary intoxication, the trial court instructed the jury:

"The statutes of this State provide that drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness be occasioned by the fraud, contrivance or force of some other person or persons for the purpose of causing the perpetration of an offense. But you are instructed, nevertheless, that you may consider whether or not at the time of the alleged murder the defendant was under the influence of any intoxicating liquor to such an extent as to be utterly incapable of forming any intent to commit the crime of murder in the first degree. And if you find that at the time he was so utterly incapable of forming the intention to commit the aforementioned offense, or if upon a consideration of all the evidence you have a doubt with reference thereto, you will find the defendant not guilty of murder in the first degree."

Here again the defendant attempts to assert that voluntary drunkenness is such as to render him mentally

incapable of committing second degree murder. He maintains that the existence of malice required in a first degree murder charge may be negatived by intoxication and that because malice, although implied, is also a necessary ingredient of murder in the second degree, intoxication may negative the necessary capacity to be guilty of that crime. Defendant fails to perceive that the accountability of one who becomes drunk voluntarily is defined by statute and that it is only because of the specific intent required for first degree murder that a voluntary drunkenness is an excuse even for that crime. C.R.S. 1963, 40-1-9:

"Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness be occasioned by the fraud, contrivance or force of some other person, for the purpose of causing the perpetration of the offense, in which case the person causing said drunkenness for such malignant purpose shall be considered the principal and suffer the same punishment as would have been inflicted on the person committing the offense, * * * ."

In *Brennan v. People,* 37 Colo. 256, 86 Pac. 79, where an instruction on this issue similar to the one given in this case was approved, we held that this statute was:

"* * * simply declaratory of the common law, where it is uniformly held that drunkenness is not an excuse for crime, yet all the cases hold that when a particular intent forms the gist of the offense, as contradistinguished from the general intent necessarily entering into every crime, and is made to depend on the state and condition of the mind of the accused at the time, and with reference to the acts done and committed, drunkenness, as a fact affecting the control of the mind, is proper for the consideration of the jury in determining whether the accused was capable of entertaining the positive and particular intent requisite to make out the offense."

Except in those cases which would come within the

ruling of the Brennan case, the staute itself provides that drunkenness will *not be an excuse* for any crime where only the general intent is necessary for its commission. One who voluntarily drinks himself into unconsciousness intends whatever the foreseeable consequences or inevitable results of such intoxication are and that intent is sufficient to supply general intent for second degree murder in this case. The instruction was quite proper.

On his third assignment of error defendant challenges an instruction given by the court on the issue of self-defense. Without deciding whether the instruction was defective, we determine this assignment is without merit. Under the facts he was not entitled to an instruction on self-defense so can claim no prejudice even if the instruction was erroneous.

Finally, defendant contends that a state expert witness, Dr. Britton, should have been used by the People in its case in chief. Dr. Britton was called as a rebuttal witness on a question of the likelihood of the defendant actually suffering from traumatic amnesia. Defendant relies on what was said in *Martz v. People*, 114 Colo. 278, 162 P.2d 408, for the proposition that in a criminal case the prosecution ought to introduce all of the People's evidence. The argument has no application in the instant case. Defendant's theory of traumatic amnesia, supported by his own testimony and the expert opinion of Dr. Manns, was not presented until defendant's case, although there was some hint of it by the cross-examination of the witnesses of the People in its case in chief. The statements elicited from prosecution witnesses relative to the way in which the defendant acted after the blow did not sufficiently reach the issue of traumatic amnesia as to foreclose expert rebuttal testimony on this matter.

In the matter of rebuttal testimony, the court has discretion as to its admissibility. *Schreiner v. People*, 95 Colo. 392, 36 P.2d 764. The court did not abuse its

discretion in determining Dr. Britton's testimony to be properly admitted in rebuttal.

The final assignment of error is directed to the admission in evidence of the testimony of one Cousins to the effect that the defendant had been told that he was not to come into the 715 Club. The defendant asserts that such testimony, coupled with other evidence that Watkins had been in the 715 Club a month earlier, allowed the jury to speculate that Watkins and Stripling or Watkins and the deceased had been engaged in some feud or dispute or that Watkins was a troublemaker.

At no time was the jury told any reason why Watkins had been instructed to stay out of the Club, and in proceedings in a hearing held in chambers, out of the presence of the jury, an offer of proof was made by the People to show that the defendant had assaulted a waitress at the Club a month earlier and for that reason had been told to stay out of the establishment. The trial court limited the evidence merely for the purpose of establishing Watkins' status in the Club. It did not permit any testimony as to the assault or the previous disturbance.

The judgment is affirmed.

MR. JUSTICE MOORE not participating.