STATE v. ERVIN MERCER

No. 251

(Filed 31 January 1969)

1. Homicide § 26— second degree murder — instructions

In a homicide prosecution, an instruction to the effect that once a killing with a deadly weapon is established, it is murder in the second degree at least, is incomplete and inaccurate and is not cured by an instruction upon the presumptions arising from the establishment of an intentional killing with a deadly weapon which contains numerous errors and irrelevancies.

2. Homicide § 14— presumptions — intentional killing with deadly weapon

When the State satisfies the jury from the evidence that defendant intentionally shot the deceased with a pistol and thereby proximately caused his death, the presumptions arise that the killing was (1) unlawful and (2) with malice, and nothing else appearing, defendant would be guilty of murder in the second degree.

3. Homicide § 11— defenses — misadventure or accident

Misadventure or accident is not an affirmative defense but is merely a denial that defendant intentionally shot the deceased.

4. Homicide § 28— instructions — insanity

In a homicide prosecution, it is error for the court to instruct the jury upon the principles relating to legal insanity where there is no evidence that defendant was legally insane.

5. Homicide § 7.5— instructions — defense of unconsciousness

In a homicide prosecution, it is error for the court to restrict the jury's consideration of defendant's evidence that he was completely unconscious of what transpired when the killings occurred to the elements of premeditation and deliberation in first degree murder, unconsciousness being a complete defense to a criminal charge.

**6. Criminal Law § 113— instructions — duty to apply law to evidence**

G.S. 1-180 requires the court to instruct the jury on all substantial features of the case arising on the evidence without special request.

**7. Criminal Law § 113; Homicide § 28— instructions — defenses**

Where defendant's evidence, if accepted, discloses facts sufficient in law to constitute a defense to the crime for which he is indicted, the court is required to instruct the jury as to the legal principles applicable thereto, the weight to be given such evidence being for determination by the jury.

**8. Criminal Law § 1— definition of crime at common law**

The common law conception of crime required (1) an evil deed and (2) *mens rea* — a guilty mind.

**9. Criminal Law § 5; Homicide § 7.5— defense of unconsciousness**

A person who is unconscious at the time he commits an act which would otherwise be criminal generally cannot be held responsible therefor.

**10. Criminal Law § 5; Homicide § 7.5— defenses of insanity and unconsciousness**

Unconsciousness and insanity are separate grounds of exemption from criminal responsibility.

**11. Criminal Law § 5; Homicide § 7.5— defense of unconsciousness**

Unconsciousness is never an affirmative defense.

**12. Criminal Law § 5; Homicide § 7.5— defenses of unconsciousness and insanity**

A jury finding that defendant intentionally shot the deceased and thereby proximately caused his death negates and refutes any contention that defendant was then unconscious; notwithstanding such a finding by the jury, the defendant is exempt from criminal responsibility if he satisfies the jury he was insane when he inflicted the fatal injury.

**13. Criminal Law § 5— insanity defined**

An accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would be punishable as a crime while he is laboring under such a defect of reason from disease of the mind as to be incapable of knowing the nature and quality of the act or, if he does know this, incapable of distinguishing between right and wrong in relation to such act.

**14. Criminal Law § 5; Homicide § 7.5— insanity — unconsciousness**

Insanity is incapacity, from disease of the mind, to know the nature and quality of one's act or to distinguish between right and wrong in relation thereto; in contrast, one who is completely unconscious when he commits an act otherwise punishable as a crime cannot know the nature and quality thereof or whether it is right or wrong.

**15. Homicide § 28— instructions — defense of unconsciousness**

In a prosecution for homicide in which defendant testified that he was completely unconscious of what transpired when deceased was shot, de-

fendant was entitled to an instruction to the effect that the jury should return a verdict of not guilty if in fact defendant was completely unconscious of what transpired when deceased was shot.

**16. Criminal Law § 5; Homicide § 7.5— defense of unconsciousness**

While unconsciousness is always a factor of legal significance, it is not a complete defense under all circumstances, as where the unconsciousness is produced by voluntary intoxication.

**17. Homicide §§ 4, 5— intent to kill**

While a specific intent to kill is a necessary constituent of the elements of premeditation and deliberation in first degree murder, it is not an element of second degree murder, which is an unlawful killing with malice.

**18. Criminal Law § 43; Homicide § 20— gruesome photographs**

While the fact that an otherwise relevant and material photograph is gory or gruesome, and thus may tend to arouse prejudice, will not alone render it inadmissible, the admission of an excessive number of photographs depicting the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors.

**19. Criminal Law § 43; Homicide § 20— photographs of crime scene**

In a consolidated trial of defendant for three homicides, four photographs depicting substantially the same scene which were identified as accurate representations of the clothed dead body of one victim at the crime scene and blood where another victim was found when officers arrived are competent for illustrative purposes, and whether all or a less number should have been admitted was within the discretion of the trial judge.

**20. Criminal Law § 43; Homicide § 20— photographs of corpse**

In a homicide prosecution, three photographs of the deceased's body at the funeral home with projecting probes indicating the point of entry, the course, and the point of exit of the bullet that caused his death are inflamatory and have no probative value in respect of any issue for determination by the jury where the evidence is uncontradicted as to the cause of death and all the evidence tended to show deceased was lying on a bed when shot.

On writ of *certiorari* to the Court of Appeals.

Separate indictments charged defendant with the first degree murder on September 14, 1967, of (1) Myrtle R. Mercer, defendant's wife, (2) Ida Mae Dunn, and (3) Jeffrey Lane Dunn, Ida's five-year-old son. The three indictments were consolidated for trial and tried before Parker, J., at February 1968 Criminal Session of Wilson.

Evidence was offered by the State and by defendant.

There was evidence tending to show the facts narrated below.

Defendant, a member of the United States Army for 19½ years, was stationed at Fort Benning, Georgia, at the time of the trial.

Defendant and Myrtle Mercer were married in Fayetteville, N. C., in April, 1965. Thereafter, he was stationed at duty posts in and out of the United States. Myrtle Mercer, Ida Mae Dunn, and Jeffrey Lane Dunn, Ida's five-year-old boy, lived together in Wilson, N. C. Defendant visited Myrtle in Wilson from time to time when on leaves. He was thirty-nine; Myrtle was twenty-three.

Marital difficulties developed. Defendant had heard that Myrtle was having affairs with other men. He thought Myrtle's relationship with Ida involved more than normal affection. As time passed, defendant's strong affection for Myrtle was not reciprocated.

On July 6, 1967, defendant received a letter from Myrtle, referred to in the evidence as a "Dear John" letter, in which she told him she was tired of being tied down and wanted to come and go as she pleased. In a letter mailed August 10th from Kentucky (where he was then stationed), defendant wrote Myrtle: "Please don't make me do something that will send both of us to our graves." Also: "I could never see you with another man, and I would die and go to hell before I would see you with some other man, and take myself with you."

In September, 1967, defendant obtained a ten-day leave "to come home and see if he could get straightened out with his wife. . . ." Defendant told his first sergeant that "if he did not get straightened out he would not be back."

On September 13, 1967, defendant visited the house in Wilson where Myrtle, Ida, and Jeffrey lived. He talked with Myrtle. However, she would not discuss their marital problems and did not want him to stay at that house.

Defendant stayed at the home of his cousin, Mrs. Mable Owens, in Tarboro. He left there on the morning of September 14, 1967, and arrived at Myrtle's around noon. She would not talk with him. (Note: Defendant testified Myrtle at that time gave him some clothes, a camera and a paper bag containing a pistol he had given to her for her protection.) At the conclusion of this visit, he returned to the home of Mrs. Owens. Sometime during the day defendant bought a pint of vodka and had two drinks from it.

About 8:30 p.m., Mrs. Owens, at the request of defendant, drove defendant to Myrtle's house in Wilson. The two children of Mrs.

Owens accompanied them. Defendant knocked. There was no response. The house was unlighted and apparently no one was there. They left and visited defendant's brother (in Wilson) for some twenty-five or thirty-five minutes. While there, defendant telephoned Myrtle's house. The line was busy. They went back to Myrtle's house. Defendant asked Mrs. Owens if she and her children would go into the house with him. She replied that they would wait in the car.

Defendant went to the front door and knocked several times. There was no answer. Defendant shot at the door twice, pushed it open with his foot and went inside. At that time, a light came on in the front bedroom. Someone said, "Ervin, don't do that." Defendant fired three or four shots killing Myrtle instantly and fatally wounding Ida and Jeffrey. He then left the house. A neighbor called the police.

The police arrived about 10:30 p.m. In the front room, they found Myrtle, dead, and Ida and Jeffrey gasping for breath. Later that evening or early the next morning Ida and Jeffrey died.

Defendant was arrested at the home of his brother in Wilson, a few hours after the fatal shots were fired. He accompanied the officers to a lot behind Myrtle's house where the gun which inflicted the fatal injuries was hidden.

Testimony of defendant, in addition to that referred to above, is set out in the opinion. It tended to show he was completely unconscious of what transpired when Myrtle, Ida and Jeffrey were shot.

In each case, the jury returned a verdict of guilty of murder in the second degree. In each case, the court pronounced a judgment imposing a prison sentence of not less than twenty nor more than twenty-five years, the sentences to run consecutively. Defendant entered numerous exceptions and, upon appeal to the Court of Appeals, assigned as error (1) the denial of his motions for judgment as in case of nonsuit, (2) rulings relating to the admission or exclusion of testimony, and (3) excerpts from the charge as given and the refusal to charge as requested by defendant. The Court of Appeals found "No Error." 2 N.C. App. 152, 162 S.E. 2d 563.

Defendant sought *certiorari*, and the writ was granted, for review by this Court of the questions considered and discussed in the opinion.

*Attorney General Bruton and Deputy Attorney General McGalliard for the State.*

*Farris & Thomas for defendant appellant.*

BOBBITT, J.

The evidence, when considered in the light most favorable to the State, was sufficient to require submission to the jury and to support verdicts of guilty of murder in the first degree. There is no substance to the contention that the motion to dismiss as in case of nonsuit should have been allowed. However, assignments of error, based on exceptions to the charge, are well taken.

The court's instructions include the following: "(W)hen an intentional killing with a deadly weapon is admitted or established, the law then casts upon the defendant the burden of showing to the satisfaction of the jury, not by the greater weight of the evidence, nor beyond a reasonable doubt, but simply to satisfy the jury (of) the legal provocation that will rob the crime of malice and thus reduce it to manslaughter, or that will excuse it altogether upon some grounds recognized in law as a defense, such as insanity or misadventure or accident, or self-defense or some other. (That is, gentlemen of the jury, once the killing is admitted or established with a deadly weapon, the law presumes malice, a presumption of malice arises, and therefore it is an unlawful killing with malice, it's murder in the second degree at least.)"

[1, 2]   Defendant excepted to and assigns as error the portion of the quoted excerpt enclosed by parentheses. This particular sentence, standing alone, states without qualification that "once the killing is admitted or established with a deadly weapon . . . it's murder in the second degree *at least.*" (Our italics.) It is inaccurate, in conflict with the preceding instruction and tends to confuse rather than clarify. The factual situation called for an instruction in the case involving Myrtle (and a similar instruction in the cases involving Ida and Jeffrey) substantially as follows: If the State has satisfied the jury from the evidence beyond a reasonable doubt that the defendant *intentionally* shot Myrtle with a .38 pistol and thereby proximately caused her death, two presumptions arise: (1) That the killing was unlawful, and (2) that it was done with malice; and, *nothing else appearing,* the defendant would be guilty of murder in the second degree. *State v. Propst,* 274 N.C. 62, 70-71, 161 S.E. 2d 560, 567, and cases cited. "The intentional use of a deadly weapon as a weapon, when death proximately results from such use, gives

rise to the presumptions." *State v. Gordon*, 241 N.C. 356, 358, 85 S.E. 2d 322, 324.

In the quoted excerpt, preceding the portion to which defendant excepted, the court instructed the jury that "when *an intentional killing* with a deadly weapon is admitted or established, the law then casts upon the defendant the burden of showing to the satisfaction of the jury, not by the greater weight of the evidence, nor beyond a reasonable doubt, but simply to satisfy the jury (of) the legal provocation that will rob the crime of malice and thus reduce it to manslaughter, or that will *excuse it altogether upon some grounds recognized in law as a defense, such as insanity or misadventure or accident, or self-defense* or some other." (Our italics.)

[3, 4]   There was no evidence of self-defense. There was no evidence of misadventure or accident. Moreover, misadventure or accident is not an *affirmative* defense but merely a denial that defendant intentionally shot the deceased. *State v. Phillips*, 264 N.C. 508, 142 S.E. 2d 337; *State v. McLawhorn*, 270 N.C. 622, 628, 155 S.E. 2d 198, 203; *State v. Fowler*, 268 N.C. 430, 150 S.E. 2d 731. As to insanity, the record discloses: In a portion of the charge to which defendant excepted, extensive instructions were given with reference to insanity. However, near the conclusion of the charge, in an instruction to which defendant excepted, the court charged the jury as follows: "(U)nder the evidence in the case, as the Court understood the evidence, there is no evidence of legal insanity, no evidence of insanity that would have a legal recognition." We agree there was no evidence defendant was legally insane. Under the circumstances, it is unnecessary to consider whether the instructions given as to legal insanity were correct. It is, however, error to instruct the jury as to legal principles unrelated to the factual situation under consideration. *State v. Duncan*, 264 N.C. 123, 141 S.E. 2d 23.

[1]   The instruction preceding the sentence to which defendant excepted is fraught with errors and irrelevancies. Under these circumstances, it cannot be considered sufficient to cure the incompleteness and inaccuracy in the instruction to which defendant excepted.

Defendant testified that, when he went upon the porch, he took with him, in a bag, the pistol Myrtle had turned over to him earlier that day; that he had given it to her originally for her protection and was returning it to her for this purpose; that he walked up on the porch, knocked on the door, "heard somebody walking there in the house," laid the pistol in a porch chair beside the door; that he knocked on the window and then knocked twice on the door; and that the next thing he knew, "right out of the blue sky, Myrtle just

hollered out and said, 'If you don't get off the damn porch, I'm going to call the police on you'"; and, from that point, he was "blank in (his) mind." He testified that, when he became conscious, he was standing on the porch and that the pistol, which was beside his head, clicked.

The court's final instructions were as follows: "(T)he Court instructs you that the evidence in regard and surrounding the alleged loss of memory by the defendant will be considered by you *on the question of premeditation and deliberation in the charge of murder in the first degree.* . . . if you find from the evidence, not by the greater weight, nor by the preponderance, but if the defendant has satisfied you — merely satisfied you — that he lost consciousness, sufficient consciousness, to the extent that he did not have sufficient time to *premeditate or deliberate,* that is, if he did not have sufficient time to form in his mind the intent to kill, under the definition of *premeditation* and *deliberation,* then it would be your duty to return a verdict of not guilty of murder in the first degree, because the Court has instructed you if the State has failed to satisfy you of the element of *premeditation* or *deliberation,* or if there arises in your minds a reasonable doubt in regard to those two elements or either one of those two elements, it would be your duty to return a verdict of not guilty. And further in regard, when you come to consider those elements of *premeditation* and *deliberation,* if the defendant has satisfied you, not beyond a reasonable doubt, not by the greater weight of the evidence, but has merely satisfied you that he lost consciousness to such an extent that he was unable to *premeditate,* and was unable to *deliberate,* according to the definition of those terms that the law has given you, then he could not be guilty of murder in the first degree, and it would be your duty to return a verdict of not guilty as to murder in the first degree, under those circumstances. Now, *the Court feels that those are the only two elements in the case in which this evidence in regard to his loss of consciousness applies,* and the Court has ruled that there is no element of legal insanity in the evidence." (Our italics.)

[5]     Defendant's assignment of error, based on his exception to the foregoing portion of the charge, must be sustained. Defendant testified he was completely unconscious of what transpired when Myrtle, Ida and Jeffrey were shot. The court instructed the jury that this evidence was for consideration *only* in respect of the elements of premeditation and deliberation in first degree murder. This restriction of the legal significance of the evidence as to defendant's unconsciousness was erroneous.

**[6, 7]**    G.S. 1-180 requires a trial judge to instruct the jury as to "every substantial and essential feature of the case embraced within the issue and arising on the evidence, and this without any special prayer for instructions to that effect." *State v. Merrick*, 171 N.C. 788, 795, 88 S.E. 501, 505; *State v. Ardrey*, 232 N.C. 721, 62 S.E. 2d 53, and cases cited. Where defendant's evidence, if accepted, discloses facts sufficient in law to constitute a defense to the crime for which he is indicted, the court is required to instruct the jury as to the legal principles applicable thereto. What weight, if any, is to be given such evidence, is for determination by the jury. *State v. Wagoner*, 249 N.C. 637, 107 S.E. 2d 83.

**[8]**    "To put the subject in perspective, we must start with the common law's conception of crime. The common law required (1) an evil deed and (2) *mens rea* — a guilty mind." Weintraub, C.J., concurring in *State v. Sikora*, 44 N.J. 453, 210 A. 2d 193 (1965).

**[9]**    "If a person is in fact unconscious at the time he commits an act which would otherwise be criminal, he is not responsible therefor. The absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability." 1 Wharton's Criminal Law and Procedure (Anderson), § 50, p. 116.

"Unconsciousness is a complete, not a partial, defense to a criminal charge." 21 Am. Jur. 2d, Criminal Law § 29, p. 115.

"*Unconsciousness.* A person cannot be held criminally responsible for acts committed while he is unconscious. Some statutes broadly exempt from responsibility persons who commit offenses without being conscious thereof. Such statutes, when construed in connection with other statutes relating to criminal capacity of the insane and voluntarily intoxicated, do not include within their protection either insane or voluntarily intoxicated persons, and are restricted in their contemplation to persons of sound mind suffering from some other agency rendering them unconscious of their acts. . . ." 22 C.J.S., Criminal Law § 55, p. 194.

**[10]**    Defendant contends he had no knowledge of and did not consciously commit the act charged in the indictments. He does not contend he was insane. Unconsciousness and insanity are separate grounds of exemption from criminal responsibility.

In certain jurisdictions statutes provide that all persons are capable of committing crime except those in enumerated classes, one excepted class being insane persons and a separate excepted class being persons who commit the acts charged without being conscious

thereof. See California, Penal Code § 26, subdivisions 3 and 5, and Oklahoma, Penal Code § 152, subdivisions 4 and 6.

As stated by Brett, J., in *Carter v. State*, 376 P. 2d 351 (Okl. Cr. 1962): "It should be noted that it has been clearly pointed out that a defense of insanity and defense of unconsciousness are not the same, either by statutory definition or by interpretation of the courts." Decisions cited in support of this statement are: *People v. Martin*, 87 Cal. App. 2d 581, 197 P. 2d 379; *People v. Taylor*, 31 Cal. App. 2d 723, 88 P. 2d 942. Accord: *People v. Hardy*, 33 Cal. 2d 52, 198 P. 2d 865.

[11, 12] This distinction is noted. Unconsciousness is never an *affirmative* defense. The presumptions of unlawfulness and of malice arise when, and only when, the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant *intentionally* shot the deceased and thereby proximately caused his death. A jury finding to this effect negates and refutes any contention the defendant was then unconscious. However, notwithstanding such a finding by the jury, the defendant is exempt from criminal responsibility if he satisfies the jury he was insane when he inflicted the fatal injury.

[13, 14] In accordance with cited prior decisions, Ervin, J., in *State v. Swink*, 229 N.C. 123, 47 S.E. 2d 852, restated the established rule in this jurisdiction as follows: "(A)n accused is legally insane and exempt from criminal responsibility by reason thereof if he commits an act which would otherwise be punishable as a crime, and at the time of so doing is laboring under such a defect of reason, from disease of the mind, as to be incapable of knowing the nature and quality of the act he is doing, or, if he does know this, incapable of distinguishing between right and wrong in relation to such act." Subsequent decisions in accord include the following: *State v. Creech*, 229 N.C. 662, 674, 51 S.E. 2d 348, 357; *State v. Spence*, 271 N.C. 23, 38, 155 S.E. 2d 802, 814. Insanity is incapacity, from disease of the mind, *to know the nature and quality* of one's act or *to distinguish between right and wrong* in relation thereto. In contrast, a person who is completely unconscious when he commits an act otherwise punishable as a crime cannot know the nature and quality thereof or whether it is right or wrong. As stated succinctly by Francis, J., in *State v. Sikora, supra:* "Criminal responsibility must be judged at the level of the conscious."

Statements in accord with the quoted excerpts from Wharton, Am. Jur. 2d and C.J.S. are set forth in the opinions in the following cases: *People v. Baker*, 42 Cal. 2d 550, 575, 268 P. 2d 705, 720;

*People v. Anderson,* 63 Cal. 2d 351, 366, 46 Cal. Rptr. 763, 773, 406 P. 2d 43, 53; *People v. Gorshen,* 51 Cal. 2d 716, 727, 336 P. 2d 492, 499; *People v. Wilson,* 59 Cal. Rptr. 156, 427 P. 2d 820 (1967); *Carter v. State, supra; Fain v. Commonwealth,* 78 Ky. 183, 39 Am. Rep. 213 (1879); *Smith v. Commonwealth,* 268 S.W. 2d 937 (Ky. 1954); *Corder v. Commonwealth,* 278 S.W. 2d 77 (Ky. 1955); *Watkins v. Commonwealth,* 378 S.W. 2d 614 (Ky. 1964).

*People v. Wilson, supra,* involved a factual situation similar to that now under consideration. In brief, there was evidence that the defendant, armed, entered his estranged wife's apartment where he shot and killed her and one of the three men (two fled) who were in the apartment when he arrived. The defendant testified he did not remember firing and did not know what happened during the shootings. The Supreme Court of California held the trial judge erred in refusing to give proffered instructions, which included the following:

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of Law does not apply to a case in which the mental state of the person in question is due to insanity, mental defect or voluntary intoxication resulting from the use of drugs or intoxicating liquor, but applies only to cases of the unconsciousness of persons of sound mind as, for example, somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious mind.

"When the evidence shows that a person acted as if he was conscious, the law presumes that he then was conscious. The presumption, however, is disputable and may be overcome or questioned by evidence to the contrary."

In *People v. Wilson, supra,* Peters, J., for the Court, said: "That the proffered instructions on unconsciousness should have been given was decided in *People v. Bridgehouse,* 47 Cal. 2d 406, 303 P. 2d 1018." After reviewing the factual situation in *Bridgehouse,* which, as to evidence of unconsciousness, seems less favorable to the defendant than the evidence in the case now under consideration, Justice Peters continued: "It was stated in *Bridgehouse, supra* (47 Cal. 2d at p. 414, 303 P. 2d 1018), that it was error for the court to refuse the instructions on the legal effect of unconsciousness offered by the defendant and upon which he relied as a defense. (Citations

omitted.) In *Bridgehouse,* as here, the only evidence of unconsciousness came from the defendant."

The instructions proffered and refused in *People v. Wilson, supra,* referred to as CALJIC No. 71-D, apparently are *standard* instructions in California.

There was no evidence defendant was a somnambulist or an epileptic. Nor was there evidence he was under the influence of intoxicants or narcotics. Under cross-examination, defendant testified his only previous "blackout" experience, which was of brief duration, occurred when he received and read the "Dear John" letter.

[15]    Upon the present record, defendant was entitled to an instruction to the effect the jury should return verdicts of not guilty if in fact defendant was *completely* unconscious of what transpired when Myrtle, Ida and Jeffrey were shot.

The State's evidence tends to show defendant *intentionally* shot Myrtle (Ida, Jeffrey) with a .38 pistol and thereby proximately caused her (his) death. If the jury should so find from the evidence beyond a reasonable doubt, two presumptions would arise, namely, that the killing was unlawful and that it was done with malice; and, nothing else appearing, the defendant would be guilty of murder in the second degree. In such event, there is nothing in the record now before us that would reduce the crime from murder in the second degree to manslaughter or that would excuse it.

[16]    It should be understood that unconsciousness, although always a factor of legal significance, is not a complete defense under all circumstances. Without undertaking to mark the limits of the legal principles applicable to varied factual situations that will arise from time to time, but solely by way of illustration, attention is called to the following: In California, "unconsciousness produced by voluntary intoxication does not render a defendant incapable of committing a crime." *People v. Cox,* 67 Cal. App. 2d 166, 153 P. 2d 362, and cases cited. In Colorado, a person who precipitates a fracas and as a result is hit on the head and rendered semi-conscious or unconscious cannot maintain that he is not criminally responsible for any degree of homicide above involuntary manslaughter, or that he is not criminally responsible at all. *Watkins v. People,* 158 Colo. 485, 408 P. 2d 425. In Oklahoma, a motorist is guilty of manslaughter if he drives an automobile with knowledge that he is subject to frequent blackouts, when his continued operation of the automobile is in reckless disregard to the safety of others and constitutes culpable or criminal negligence. *Carter v. State, supra; Smith v. Com-*

*monwealth, supra.* As to somnambulism, see *Fain v. Commonwealth, supra,* and *Lewis v. State,* 196 Ga. 755, 27 S.E. 2d 659.

**[17]** The record shows the court defined murder in the second degree as the unlawful and *intentional killing* of a human being with malice. Although not assigned as error, it seems appropriate to point out again that "(a) specific intent *to kill,* while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter." *State v. Gordon, supra.* An *unlawful killing* with malice is murder in the second degree

Discussion of defendant's other assignments of error based on exceptions to the charge is deemed unnecessary. The asserted errors to which they relate will not likely recur at the next trial. Errors heretofore discussed require that defendant be awarded a new trial.

Although not the basis of decision, it seems appropriate to refer to defendant's assignments of error relating to photographs admitted in evidence, over objections by defendant, to illustrate the testimony of witnesses.

**[18]** "If a photograph is *relevant and material,* the fact that it is gory or gruesome, and thus may tend to arouse prejudice, will not alone render it inadmissible." (Our italics.) Stansbury, North Carolina Evidence, Second Edition, § 34, pp. 66-67; *State v. Porth,* 269 N.C. 329, 337, 153 S.E. 2d 10, 16. But where a prejudicial photograph is relevant, competent and therefore admissible, the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors. *State v. Foust,* 258 N.C. 453, 460, 128 S.E. 2d 889, 894.

Exhibits 4, 5 and 6, identified as accurate representations of the front door, including the lock and of the interior of the portion of the house from the front door to the bedroom, were properly admitted.

**[19]** Exhibits 1, 2, 3 and 7 were identified as accurate representations of the clothed (sweater and slacks) dead body of Myrtle, lying on the bed, and the splotch of blood on the portion of the bed where, according to testimony, Jeffrey was lying when the officers arrived. These four photographs, which depict substantially the same scene, were competent to illustrate the testimony. Whether all or a less number should have been admitted was for determination by the trial judge in the exercise of his discretion.

[20]　Exhibits 8, 9 and 10 were identified as accurate representations of the dead body of Jeffrey at the funeral home. The boy's lifeless body is shown with projecting probes indicating the point of entry, the course, and the point of exit, of the bullet that caused his death. The evidence was uncontradicted as to the cause of death. Moreover, all the evidence tended to show Jeffrey was lying on the bed when shot. These photographs, depicting scenes which are poignant and inflammatory, have no probative value in respect of any issue for determination by the jury.

Exhibit 11, referred to in the evidence as an accurate representation of the dead body of Ida at the funeral home, is not among the exhibits on file in this Court. While we refrain from explicit ruling with reference thereto, it would seem the observations with reference to the photographs depicting the dead body of Jeffrey would be applicable to this photograph depicting the dead body of Ida.

For the errors indicated, the decision of the Court of Appeals is reversed and the cause is remanded to that Court with direction to award a new trial in each of the three cases, to be conducted in accordance with the legal principles stated herein.

Error and remanded.