**Robert Brian FULCHER, Appellant (Defendant),**

v.

**STATE of Wyoming, Appellee (Plaintiff).**

. No. 5466.

Supreme Court of Wyoming.

Aug. 26, 1981.

Rehearing Denied Sept. 16, 1981.

Robert T. Moxley, Wheatland, for appellant.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., Allen C. Johnson, Senior Asst. Atty. Gen., and Randal R. Arp, Asst. Atty. Gen. (argued), for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

Appellant-defendant was found guilty of aggravated assault without dangerous weapon in violation of § 6-4-506(a), W.S. 1977,[1] by the district court sitting without a jury. While appellant characterizes the issues on appeal differently, we believe the issues to be:

1) Is it necessary for a defendant to plead "not guilty by reason of mental illness or deficiency" before evidence of unconsciousness can be presented?

2) Was there sufficient evidence to sustain appellant's conviction?

We will affirm.

On November 17, 1979, the appellant consumed seven or eight shots of whiskey over a period of four hours in a Torrington bar, and had previously had a drink at home.

Appellant claims he got in a fight in the bar restroom, then left the bar to find a friend. According to his testimony, the last thing he remembers until awakening in jail, is going out of the door at the bar.

Appellant and his friend were found lying in the alley behind the bar by a police officer who noted abrasions on their fists and faces. Appellant and his friend swore, were uncooperative, and combative. They were subsequently booked for public intoxication and disturbing the peace. During booking appellant continued to swear, and said he and his friend were jumped by a "bunch of Mexicans." Although his speech was slurred, he was able to verbally count his money, roughly $500 to $600 in increments of $20, and was able to walk to his cell without assistance.

Appellant was placed in a cell with one Martin Hernandez who was lying unconscious on the floor of the cell. After the jailer left the cell, he heard something that sounded like someone being kicked. He ran back to the cell and saw appellant standing by Hernandez. When the jailer started to leave again, the kicking sound resumed, and he observed appellant kicking and stomping on Hernandez's head. Appellant told the officer Hernandez had fallen out of bed. Hernandez was bleeding profusely and was taken to the hospital for some 52 stitches in his head and mouth. He had lost two or three teeth as a result of the kicking.

Appellant was released later in the day, November 18, 1979, and went home. He went back to Torrington on November 22, 1979, to see a doctor. Appellant testified that the doctor diagnosed he had a concussion, although there is no evidence in the record of medical treatment.

At his arraignment in district court, appellant first entered a plea of "not guilty by reason of temporary mental illness." Upon being advised by the trial judge that he would have to be committed for examination pursuant to § 7-11-304, W.S.1977, he withdrew that plea and entered a plea of not guilty.

In preparation for trial, appellant was examined by Dr. Breck LeBegue, a forensic

---

1. Section 6-4-506(a), W.S.1977:

   "(a) If any person shall unlawfully and maliciously inflict upon another person, any grievous bodily harm the person so offending shall be fined not more than one thousand dollars ($1,000.00) or be confined in the county jail not more than one (1) year, or both."

psychiatrist. The doctor reviewed the police report and conducted a number of tests.

At the trial Dr. LeBegue testified that in his expert medical opinion appellant suffered brain injury and was in a state of traumatic automatism at the time of his attack on Hernandez. Dr. LeBegue defined traumatic automatism as the state of mind in which a person does not have conscious and willful control over his actions, and lacks the ability to be aware of and to perceive his external environment. Dr. LeBegue further testified that another possible symptom is an inability to remember what occurred while in a state of traumatic automatism.

Dr. LeBegue was unable to state positively whether or not appellant had the requisite mental state for aggravated assault and battery, but thought appellant did not because of his altered state of mind. He could not state, however, that the character of an act is devoid of criminal intent because of mind alteration.

After the record on appeal had been filed in this court, defense counsel and the prosecuting attorney for Goshen County attempted to supplement the record by entering into a stipulation.[2] We hold that the stipulation was an improper attempt to supplement the record.

The Attorney General refused to approve the stipulation prior to its execution. He may not be bypassed, for once a case is in this court the Attorney General has complete charge of the State's case. Section 9–2–205(a), W.S.1977.[3] The county and prosecuting attorney is not the attorney of record for the State in this appeal. The stipulation, therefore, will not be considered by this Court. See also, *Hayes v. State,* Wyo., 599 P.2d 569 (1979) and *Tobin v. Purcel,* Wyo., 539 P.2d 361 (1975).

### I

We hold that the trial court properly received and considered evidence of unconsciousness absent a plea of "not guilty by reason of mental illness or deficiency."[4]

2. The substance of the stipulation:
   "COME NOW the parties in the trial Court, the defendant, Robert Brian Fulcher, by and through his attorney, Robert T. Moxley, the State of Wyoming by and through Goshen County and Prosecuting Attorney, Lowell H. Fitch, and make the following Stipulation of Facts for the purpose of clarifying the record on appeal;
   "1. At the time of the commission of the crime charged, on November 18, 1979, the defendant was suffering from a cerebral concussion;
   "2. At the time of the commission of the crime, the defendant was in an altered mental state, clinically defined as 'traumatic automatism', brought on and caused by said cerebral concussion;
   "3. That the outstanding clinical feature of said traumatic automatism is defined as 'traumatic amnesia';
   "4. That the defendant is suffering from amnesia and does not remember the occurance [sic] of the crime."

3. Section 9–2–505, W.S.1977:
   "(a) The attorney general shall prosecute and defend all suits that may be instituted by or against the state of Wyoming, the prosecution and defense of which is not otherwise provided for by law, *and he shall represent the state in all criminal cases in the supreme*

*court,* and shall defend all suits brought against the state officers in their official relations, except suits brought against them by the state. He shall be required to attend to the interests of the state in all suits, actions or claims in which the state is or may become interested *in either the supreme court of the state,* or in any of the United States courts. * * * " (Emphasis added.)

4. Formerly under Wyoming law a defendant could enter a plea of "not guilty by reason of insanity." Section 7–240, W.S.1957, repealed by Ch. 191, § 2, S. L. of Wyoming 1975. Under present law a defendant may enter a plea of "not guilty by reason of mental illness or deficiency." Rule 15, W.R.Cr.P.

   In this opinion we will use the terms insanity and mental illness or deficiency interchangeably and as having the same meaning. The issues in this case do not require that a distinction be made. It would add nothing to the opinion to explain the difference in the two terms and may, in fact, obscure the issues in this case. The case law and treatises that we will cite generally use the term, "insanity." The rationale for distinguishing the defenses of unconsciousness and insanity is substantially the same as the rationale for distinguishing the defenses of unconsciousness and mental illness or deficiency.

The defense of unconsciousness perhaps should be more precisely denominated as the defense of automatism. Automatism is the state of a person who, though capable of action, is not conscious of what he is doing. While in an automatistic state, an individual performs complex actions without an exercise of will. Because these actions are performed in a state of unconsciousness, they are involuntary. Automatistic behavior may be followed by complete or partial inability to recall the actions performed while unconscious. Thus, a person who acts automatically does so without intent, exercise of free will, or knowledge of the act.

Automatism may be caused by an abnormal condition of the mind capable of being designated a mental illness or deficiency. Automatism may also be manifest in a person with a perfectly healthy mind. In this opinion we are only concerned with the defense of automatism occurring in a person with a healthy mind. To further narrow the issue to be decided in this case, we are concerned with alleged automatism caused by concussion.

The defense of automatism, while not an entirely new development in the criminal law, has been discussed in relatively few decisions by American appellate courts, most of these being in California where the defense is statutory. Some courts have held that insanity and automatism are separate and distinct defenses, and that evidence of automatism may be presented under a plea of not guilty. Some states have made this distinction by statute. In other states the distinction is made by case law. *People v. Hardy*, 33 Cal.2d 52, 198 P.2d 865 (1948); *People v. Martin*, 87 Cal.App.2d 581, 197 P.2d 379 (1948); *People v. Taylor*, 31 Cal.App.2d 723, 88 P.2d 942 (1939); *People v. Grant*, 46 Ill.App.3d 125, 4 Ill.Dec. 696, 360 N.E.2d 809 (1977); *Carter v. State*, Okl. Cr., 376 P.2d 351 (1962); 21 Am.Jur.2d § 29, Criminal Law, p. 115 (1965).

"A defense related to but different from the defense of insanity is that of unconsciousness, often referred to as automatism: one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in a state of unconsciousness or semi-consciousness. * * * " LaFave & Scott, Criminal Law, § 44, p. 337 (1972).

"The defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act need not be the result of a disease or defect of the mind. As a consequence, the two defenses are not the same in effect, for a defendant found not guilty by reason of unconsciousness, as distinct from insanity, is not subject to commitment to a hospital for the mentally ill." *State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348, 360 (1975).

The principal reason for making a distinction between the defense of unconsciousness and insanity is that the consequences which follow an acquittal will differ. The defense of unconsciousness is usually a complete defense.[5] *State v. Mercer*, 275 N.C. 108, 165 S.E.2d 328, 334 (1969). *State v. Caddell,* supra; 21 Am.Jur.2d, Criminal Law, § 29, p. 115 (1965). That is, there are no follow-up consequences after an acquittal; all action against a defendant is concluded.

However, in the case of a finding of not guilty by reason of insanity, the defendant is ordinarily committed to a mental institution.

---

5. Unconsciousness is not a complete defense under all circumstances. An incomplete list of situations will illustrate. In California, "unconsciousness produced by voluntary intoxication does not render a defendant incapable of committing a crime." *People v. Cox*, 67 Cal.App.2d 166, 153 P.2d 362 (1944), and cases cited. In Colorado a person who participates in a fracas and as a result is hit on the head and rendered semi-conscious or unconscious cannot maintain that he is not criminally responsible. *Watkins v. People*, 158 Colo. 485, 408 P.2d 425 (1965). In Oklahoma a motorist is guilty of manslaughter if he drives an automobile with knowledge that he is subject to frequent blackouts. *Carter v. State*, Okl.Cr., 376 P.2d 351 (1962). See also, *Smith v. Commonwealth*, Ky., 268 S.W.2d 937 (1954). As to somnambulism, see *Fain v. Commonwealth*, 78 Ky. 183, 39 Am.Rep. 213 (1879); and *Lewis v. State*, 196 Ga. 755, 27 S.E.2d 659 (1943). See also § 6–1–116, W.S.1977.

" * * * [O]ne of the purposes served by the insanity defense is that it makes possible the commitment of some persons, not as an alternative to conviction and imprisonment, but rather as an alternative to outright acquittal. That is, if the defendant did not commit the acts with the mental state required for conviction of the crime charged, but this is because he was suffering from a mental disease or defect, the result is likely to be a finding of not guilty by reason of insanity followed by commitment rather than a mere finding of not guilty followed by release * * * ." LaFave and Scott, supra, at 338.

In some states the commitment is automatic after a finding of not guilty by reason of insanity. In Wyoming the trial judge may commit a defendant based on evidence produced at trial or the commitment may be by separate proceedings.[6]

The mental illness or deficiency plea does not adequately cover automatic behavior. Unless the plea of automatism, separate and apart from the plea of mental illness or deficiency is allowed, certain anomalies will result. For example, if the court determines that the automatistic defendant is sane, but refuses to recognize automatism, the defendant has no defense to the crime with which he is charged. If found guilty, he faces a prison term. The rehabilitative value of imprisonment for the automatistic offender who has committed the offense unconsciously is nonexistent. The cause of the act was an uncontrollable physical disorder that may never recur and is not a moral deficiency.

If, however, the court treats automatism as insanity and then determines that the defendant is insane, he will be found not guilty. He then will be committed to a mental institution for an indefinite period. The commitment of an automatistic individual to a mental institution for rehabilitation has absolutely no value. Mental hospitals generally treat people with psychiatric or psychological problems. This form of treatment is not suited to unconscious behavior resulting from a bump on the head.

It may be argued that evidence of unconsciousness cannot be received unless a plea of not guilty by reason of mental illness or deficiency is made pursuant to Rule 15, W.R.Cr.P. We believe this approach to be illogical.

" * * * Insanity is incapacity from disease of the mind, to know the nature and quality of one's act or to distinguish between right and wrong in relation thereto. In contrast, a person who is completely unconscious when he commits an act otherwise punishable as a crime cannot know the nature and quality thereof or whether it is right or wrong. * * * " *State v. Mercer, supra,* 165 S.E.2d at 335.

■■ It does not seem that the definition of "mental deficiency" in § 7–11–301(a)(iii),[7] W.S.1977, which includes "brain damage," encompasses simple brain trauma with no permanent aftereffects. It is our view that the "brain damage" contemplated in the statute is some serious and irreversible condition having an impact upon the ability of the person to function. It is undoubtedly something far more significant than a temporary and transitory condition. The two defenses are merged, in effect, if a plea of "not guilty by reason of mental illness or deficiency" is a prerequisite for using the defense of unconsciousness.

The committee that drafted Wyoming Pattern Jury Instructions Criminal, apparently recognized mental illness or deficiency and unconsciousness as separate and distinct defenses. See § 4.301, Wyo. P.J.I.Cr. A copy is attached hereto as Appendix A.

---

6. Section 7–11–306(a):

   "After entry of a judgment of not guilty by reason of mental illness or deficiency excluding responsibility, the court shall, on the basis of evidence given at trial or at a separate hearing, make an order as provided in subsection (b), (c) or (d) of this section."

7. Section 7–11–301(a)(iii):

   " 'Mental deficiency' means a defect attributable to mental retardation, brain damage and learning disabilities."

Admittedly the instructions in Wyo. P.J. I.Cr. are not authoritative, because they were not approved by the Wyoming Supreme Court, and this was a matter of design. Still they are the product of a distinguished group of legal scholars, including judges, attorneys and teachers of the law. The comment to this pattern jury instruction notes that it is limited to persons of sound mind, and the comment distinguishes persons suffering from "mental deficiency or illness." In this respect, it tracks the case law from other jurisdictions, which authorities hold that unconsciousness and insanity are completely separate grounds of exemption from criminal responsibility. *People v. Conley*, 64 Cal.2d 310, 49 Cal.Rptr. 815, 411 P.2d 911 (1966); *Carter v. State, supra; State v. Mercer, supra.*

■ Although courts hold that unconsciousness and insanity are separate and distinct defenses, there has been some uncertainty concerning the burden of proof. We believe the better rule to be that stated in *State v. Caddell, supra,* 215 S.E.2d at 363:[8]

> "We now hold that, under the law of this state, unconsciousness, or automatism, is a complete defense to the criminal charge, separate and apart from the defense of insanity; that *it is an affirmative defense; and that the burden rests upon the defendant to establish this defense, unless it arises out of the State's own evidence,* to the satisfaction of the jury." (Emphasis added.)

The rationale for this rule is that the defendant is the only person who knows his actual state of consciousness. *Hill v. Baxter* 1 All E. R. 193 (1958), 1 Q. B. 277.

■ Our ruling on the facts of this case is that the defense of unconsciousness resulting from a concussion with no permanent brain damage is an affirmative defense and is a defense separate from the defense of not guilty by reason of mental illness or deficiency.

## II

The appellant's conviction must, nevertheless, be affirmed. Dr. LeBegue was unable to state positively whether or not appellant had the requisite mental state for aggravated assault. He could not state that the character of the act was devoid of criminal intent because of the mind alteration. The presumption of mental competency was never overcome by appellant and the evidence presented formed a reasonable basis on which the trial judge could find and did find that the State had met the required burden of proof.

■■ Further, the trial judge was not bound to follow Dr. LeBegue's opinion. The trier of the facts is not bound to accept expert opinion evidence in the face of other substantial and credible evidence to the contrary. *State v. Peterson,* 24 N.C.App. 404, 210 S.E.2d 883 (1975). Cf., *Reilly v. State,* Wyo., 496 P.2d 899 (1972), reh. denied, 498 P.2d 1236 (1972). There was an abundance of other credible evidence that appellant was not unconscious at the time of the assault and battery for which he was convicted.

Affirmed.

## APPENDIX A

### 4.301 UNCONSCIOUS ACTS

Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

This rule of law applies only to cases of the unconsciousness of person of sound mind, in which there is no functioning of the conscious mind.

*Use Note-*

Specific examples of where this instruction would apply include: sleep walkers or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor.

---

8. *State v. Mercer*, 275 N.C. 108, 165 S.E.2d 328, 335 (1969), held that "unconsciousness is never an affirmative defense." *State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348, 363 (1975), overruled *Mercer*, supra, and stated that "it [unconsciousness] is an affirmative defense."

*Comment-*

CALJIC 4.30.

Unconsciousness is a complete, not a partial, defense to a criminal charge. *People v. Wilson,* [66 Cal.2d 749, 59 Cal.Rptr. 156,] 427 P.2d 820, 828 (Cal.1967).

There can be no criminality in the absence of criminal intention, and one who acts while unconscious lacks criminal intention. *Fair v. Commonwealth,* 78 Ky. 183 [39 Am.Rep. 213] (1879).

Wyoming has no statutory or case law in this area. Two theories have been used to support this defense in jurisdictions recognizing it. The first is that unconsciousness or semi-consciousness is a defense because one who acts while in such a condition does not have the requisite mental state for commission of a crime. The second, which is the rationale used by the Model Penal Code, § 2.01 (1962), and favored by LaFave and Scott, *Criminal Law,* § 44 (1972), is that commission of a crime requires a voluntary act or omission, and one who acts while in a state of unconsciousness or semi-consciousness has not engaged in a voluntary act.

The above instruction does not favor either of these theories because California's unconsciousness defense, from which this instruction is taken, is statutorily based. When a case involving an unconsciousness defense arises, either rationale can be adopted under the instruction as it is written.

The second paragraph of the instruction limits the availability of the unconsciousness defense to persons of sound mind. People who commit similar acts but are of unsound mind are suffering from mental illness or deficiency and are covered by the laws and instructions concerning the insanity defense.

RAPER, Justice, specially concurring, with whom ROONEY, Justice, joins.

I concur only in the result reached by the majority, except to the extent I otherwise herein indicate.[1]

1. At this early point, it can be stated that I agree with the court's holdings and discussion

The reasoning of the majority with respect to the defense of unconsciousness in this case is contrary to clear legislative will and has judicially amended the statutes of this state pertaining to mental illness or deficiency excluding criminal responsibility.

I

Dr. LeBegue's testimony was inadmissible in its entirety. " 'Mental deficiency' means a defect attributable to mental retardation, *brain damage* and learning disabilities." Section 7–11–301, W.S.1977. "A person is not responsible for criminal conduct if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." Section 7–11–304(a), W.S.1977. This was appellant's defense.

Section 7–11–304(c), W.S.1977 provides that, "[e]vidence that a person is not responsible for criminal conduct by reason of mental illness or deficiency is not admissible at the trial of the defendant unless a plea of 'not guilty by reason of mental illness or deficiency' is made. * * * " No such plea was entered.

The appellant apparently does not dispute the fact that he did in fact commit the assault on his victim as charged. While the appellant argued to the trial judge by way of a written brief that the plea of unconsciousness was not mental deficiency as contemplated by § 7–11–301 et seq., W.S.1977, the testimony of Dr. LeBegue makes it clear that appellant's condition, which he opines to have existed at the time of the crime, involved a head injury. He testified specifically:

"In my opinion he did suffer a brain injury, in my opinion did suffer *brain damage.* He suffered a concussion which is essentially a brain bruise." (Emphasis added.)

with respect to the improper supplementation of the record.

This, according to the doctor's testimony, translated into "traumatic automatism" as well as explained the appellant's amnesia, his inability to remember kicking and stomping the victim, Hernandez. Appellant cannot avoid the effects of the statute by use of the clinical language of traumatic automatism.

I prefer to believe, from the incomplete record before us, that the district court disregarded the testimony of Dr. LeBegue, it being inadmissible by statute under the defendant's plea of not guilty. It is not unusual for a trial judge in a court-tried case to listen to inadmissible evidence presented by a criminal defendant, but that does not mean that he must consider it in disposition of the case. This court presumes that in a trial before the court without a jury a judge disregarded inadmissible evidence and his judgment was based only on competent evidence. *X v. Y*, Wyo., 482 P.2d 688 (1971); 76 Am.Jur.2d, Trial § 1242, p. 194; Anno., Reception of incompetent evidence in criminal case tried to court without jury as ground of reversal, 116 A.L.R. 558.

Appellant was fully informed by the trial judge at arraignment of his right to enter a plea of not guilty by reason of mental deficiency but appellant elected not to in order to avoid commitment for examination. He cannot now complain, nor should he be excused for failure to do so.

I am not concerned with the fact that unconsciousness may be a defense in this case but am distressed that the procedure for taking advantage of it has been cast aside. In order to reach the conclusion of the majority that it is not necessary to plead mental deficiency as a defense in the case of unconsciousness, it is indispensable that it be pretended that § 7–11–301, supra, does not exist. The appellant's disorder, if it existed, was caused by "brain damage" according to the appellant's own testimony. That is "mental deficiency" by statutory definition. The majority has feebly attempted to jump the hurdle of a statutory

definition by saying "unconsciousness" is not "insanity," but we no longer use that term. It must be pointed out that under the old statutes [2] and before adoption of the current law pertaining to mental deficiency [3], "insanity" was not legislatively defined. The majority is attempting to adopt the law of an era gone by-by, rather than what the authors of the new legislation considered a more informed and modern concept.

When the legislature amends a statute, it must be presumed that some change in existing law was intended and courts should endeavor to make such amendment effective. *State ex rel. Albany County Weed and Pest District v. Board of County Commissioners of County of Albany*, Wyo., 592 P.2d 1154 (1979); *Brown v. State*, Wyo., 590 P.2d 1312 (1979). It is not reasonable that the legislature would enact a law to declare what is already the law. *DeHerrera v. Herrera*, Wyo., 565 P.2d 479 (1977). The legislature will not be presumed to intend futile things. *Yeik v. Department of Revenue and Taxation*, Wyo., 595 P.2d 965 (1979); *DeHerrera v. Herrera*, supra. When the legislature declared that mental deficiency was a defect attributable to brain damage (§ 7–11–301), that was a definition it had never before undertaken. That was then collated by the legislature with a declaration that a person is not responsible for his criminal conduct when, because of mental deficiency (which includes brain damage), he lacked the capacity to conform his conduct to the requirements of the law (§ 7–11–304(a)). Appellant's position is that being unconscious because of a blow on the head causing brain damage rendered him not responsible for kicking his victim around. We, then, now have before us a defense of mental deficiency defined by the legislature as including brain damage, not insanity which was never defined by the legislature nor this court to either include or exclude brain damage.

2. Sections 7–239 through 7–242, W.S.1957. Repealed by § 2, Ch. 191, S.L.Wyo.1975.

3. Section 7–11–301, W.S.1977, adopted by Ch. 191, S.L.Wyo.1975.

Contrary to the assumption of the majority, insanity and mental illness or deficiency do not have the same meaning and cannot be used interchangeably because mental illness and deficiency embrace a greater span of defects of the mind and are intended to reach all defenses of irresponsibility arising because of some condition of the human brain affecting conduct. Nowhere in the rewriting of the law pertaining to mental responsibility appears the word "insane" or "insanity," except in the heading to the chapter and that was probably supplied by someone unacquainted with the term. The proper heading should have been "RESPONSIBILITY." The title supplied by the legislature says nothing about insanity.[4] The term "deficiency" means "defect." Defect means the want or absence of something necessary for completeness, perfection or adequacy in form or function. Webster. It is this shortcoming in appellant's mind that brought him within the sweep of § 7–11–304(a), supra. The only exception to mental deficiency not to be considered was that covered by § 7–11–304(b):

"As used in this section, the terms 'mental illness or deficiency' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

It follows that damage to the brain causing a defect in its function would bring the appellant within the statute requiring conformity with all its provisions, i. e., commitment for examination and necessity of plea of "not guilty by reason of mental illness or deficiency."

## II

The Wyoming statute adopts the ALI Model Penal Code in principle but provides a different procedure for giving the State and court notice that mental disease or deficiency will be relied upon.[5] The Wyoming version requires the defendant to enter a plea of "not guilty by reason of mental illness or deficiency." Section 7–11–304(c), W.S.1977.

The requirement of examination upon entry of such a plea serves a valuable purpose, as explained in what has been described as the leading case on the subject, *Jessner v. State*, 202 Wis. 184, 231 N.W. 634 (1930), 71 A.L.R. 1005:

"The assault thus made upon this statute is highly important. Its enactment was in response to a well-settled conviction that, in criminal cases at least, where the interests of society were involved, there should be some technical evidence from unprejudiced and reliable sources. This conviction grew out of the belief that under the then existing procedure there was a striking tendency on the part of experts to accommodate their opinions to the necessities of that side of the case upon which they were testifying, and

---

4. Chapter 191, S.L.Wyo.1975:
   "AN ACT to create W.S. 7–242.1 through 7–242.6; and to repeal W.S. 7–239 through 7–242 relating to lack of mental capacity as a bar to trial or conviction in criminal cases; examinations; reports; commitment; separation of issues of guilt and mental illness or deficiency at trials where pleas of not guilty and not guilty by reason of mental illness or deficiency are both plead; and providing an effective date."

5. Section 4.03 of the ALI Model Penal Code:
   "(1) Mental disease or defect excluding responsibility is an affirmative defense.
   "(2) Evidence of mental disease or defect excluding responsibility is not admissible unless the defendant, at the time of entering his plea of not guilty or within ten days thereafter or at such later time as the Court may for good cause permit, files a written notice of his purpose to rely on such defense.

"(3) When the defendant is acquitted on the ground of mental disease or defect excluding responsibility, the verdict and the judgment shall so state."

Subsection (3) of this section appears as part of § 7–11–305(a), W.S.1977, Cum.Supp.1981:
   "(a) When a defendant couples a plea of not guilty with a plea of not guilty by reason of mental illness or deficiency, proof shall be submitted before the same jury in a continuous trial on whether the defendant in fact committed the acts charged, on the remaining elements of the alleged criminal offense and on the issue of mental responsibility of the defendant. In addition to other forms of verdict submitted to the jury, the court shall submit a verdict by which the jury may find the defendant not guilty by reason of mental illness or deficiency excluding responsibility."

that such opinions were to a very large extent prejudicial and unreliable. To secure the reliable and unprejudiced opinions of the ablest experts in such cases, to the end that the purest degree of justice might be promoted, the board of circuit judges sponsored the enactment of this statute. If this statute must be condemned as unconstitutional, it will require retracement of most significant forward steps in judicial procedure, and bring regret to all who believe in steady progress towards the attainment of a more perfect justice.

\* \* \* \* \* \*

"By the statute under consideration the Legislature has deliberately attempted to regulate the subject of expert evidence in criminal trials, to the end that there may be some evidence in the case, not bought and paid for, coming from impartial witnesses who owe no duty or allegiance to either side of the controversy, and that the fact of their impartiality shall be made known to the jury. Whether the sponsoring of any witness by the court is good public policy is no longer a matter of judicial opinion. The dominant opinion of the Legislature upon that subject has received expression, and its expression upon matters of public policy prevails, unless it contravenes constitutional provisions. We find no constitutional provision relating to jury trials which prohibits the practice thus prescribed by the Legislature.

\* \* \* \* \* \*

"The function of these experts is to aid in the administration of justice by furnishing reliable and unprejudiced opinions upon a technical subject. The whole purpose of their creation and appointment is to promote the accomplishment of the very purposes for which courts are established. This is accomplished not independently of, but within and under the direction of, the court, and in conformity with the practices of the court. For the purposes of that particular trial they are a part of the machinery of the court. They render assistance to the court.

These considerations lead to the conclusion that their appointment is a most appropriate judicial function. The statute cannot be condemned on this ground."

This procedure has likewise been upheld in this state. *State v. Riggle*, 76 Wyo. 63, 298 P.2d 349, 300 P.2d 567 (1956), cert. denied 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366; *State v. Spears*, 76 Wyo. 82, 300 P.2d 551 (1956).

In the case before us and in other cases of mental deficiency caused by blows on the head, if the defendant claims automatism, society and the State have been and will be deprived of this preliminary examination without notice of the defense of unconsciousness and without the opportunity for an adequate impartial examination. All defendants will be claiming unconsciousness when in fact they should have entered pleas of "not guilty by reason of mental illness or deficiency." That the appellant utilized the aid of a psychiatrist to establish unconsciousness because of brain damage, within the definition of the statute, indicates the need for the pretrial procedures of commitment for mental examination. It may have established that appellant's condition was not of a temporary nature, that there were underlying psychoses aggravated by the blow, if true, and that defendant needed continuing commitment for treatment. Society's rights have been and will be usurped by the majority opinion. The preliminary psychiatric examination is a good point to wash out the phony claims of mental illness or deficiency and identify the legitimate as well.

### III

The majority has taken the mistaken view that a little old bump on the head is not serious. We do not know from the record how much of a blow on the head causing concussion and brain damage was received by appellant. X-rays were taken but they did not appear in the record nor was there any testimony other than that it was enough to create unconsciousness. While *maybe* not serious in this case, if true

at all, a concussion is no matter with which to so lightly deal. The superficial treatment of brain damage by the majority requires more comprehensive attention to dispel such a myopic approach. The authors of the Attorneys' Textbook of Medicine, Gordy-Gray, point out that a blow on the head is not trifling:

¶ 88.31, p. 80–20, in pertinent part:

"As a result of diffuse destruction of functioning nerve cells there may be what is known as 'brain damage' with general, more or less non-specific, effects on intellectual functions, behavior and personality. These may be superimposed on more localized residual neurological deficits, or may occur without neurological disability of a localized kind."

¶ 88.60, p. 88–53, in pertinent part:

"The most complex general effects of trauma involve the higher integrated activities of the brain (intellectual capacity, memory, speech, consciousness, behavior and personality). These are added to the more localized effects of ruptured blood vessels (hemorrhage and hematoma), fractured bone and contused brain tissue."

¶ 88.68(5), pp. 88–71 through 88–72:

"The classification of 'brain syndromes' in the American Psychiatric Association Manual, as acute or chronic, has already been discussed elsewhere (See Chapter 90, ¶ 90.71, ¶ 90.71(1) on acute brain syndromes, ¶¶ 90.71(2) through 90.76 on chronic brain syndromes.) The acute brain syndrome is defined as one which is reversible, while in the chronic brain syndrome the brain changes are irreversible and permanent. Chronic brain syndrome due to trauma is synonymous with traumatic encephalopathy or the 'brain-damaged' individual. The brain changes, by definition, are diffuse and encompass all aspects of the higher integrative activities of the brain (orientation, memory, intellectual functions such as comprehension, knowledge, and learning, judgment, and emotional and behavioral reactions). In the acute brain syndrome there is impairment in all of these spheres also, but it is postulated that the condition may be reversed so that recovery takes place.

"In severe head injuries one of the complications which may develop is an 'acute brain syndrome,' taking the form either of an acute delirium or an acute psychosis of the toxic type.

\* \* \* \* \* \*

"In the state of delirium there is disorientation, especially in respect to time. There are also disordered perceptions leading to visual illusions and hallucinations. Visual hallucinations are quite characteristic of drug psychoses, as compared with the auditory hallucinations of the acute schizophrenic episode. The delirious patient is usually markedly hyperactive and restless and frequently requires some kind of restraint.

"In toxic states the patient may be hyperactive and restless, disoriented and emotionally unstable, or stuporous, apathetic and retarded.

\* \* \* \* \* \* "

¶ 88.72, pp. 88–74 through 88–75, in pertinent part:

"Other deficits and impairments involving the *higher integrative functions* of the brain are more complex and less easily demonstrable on objective testing. These include disturbances of consciousness, disturbances of memory function, of sleep patterns, and intellectual activities such as comprehension, knowledge, new learning, ability to concentrate, judgment and foresight."

¶ 88.73, pp. 88–75 through 88–76:

"*There is only one way to approach a comprehensive evaluation of disability after trauma to the head.* [Emphasis added.]

"Each structure (the scalp, skull, brain, cranial nerves and blood vessels) must first be evaluated separately as to the initial *local* injury, degree of recovery, and possible residual alterations, either structural or physiological, which remain. This kind of more or less 'local' survey includes also evaluation of the effects of any specific local complication which oc-

curred, and the degree of recovery or residual impairment which remains.

"Each phase of the higher integrated activities of the brain must then be evaluated to determine whether there is any residual impairment or disability. These higher activities include:

"(1) The state of consciousness, i. e., confusion, prolonged coma, and so on,

"(2) Memory functions, i. e., amnesias or impaired retention and recall,

"(3) Speech and related functions of reading and writing,

"(4) Intellectual capacities, i. e., comprehension, knowledge, new learning, concentration, judgment, foresight,

"(5) Behavioral reactions,

"(6) Personality changes,

"(7) Emotional responses, and finally

"(8) The state of the 'psyche' as a whole, i. e., the whole person and his reactions to his injuries.

\*     \*     \*     \*     \*     \* ''

¶ 88.75(5), p. 88–86:

"There may be residual impairments of consciousness (confusion, stupor, prolonged coma), of sleep (hypersomnia, narcolepsy), of memory (amnesias and impaired retention and recall), of intellectual capacities (comprehension, concentration, knowledge, new learning, judgment, foresight), of behavior responses and emotional reactions.

"In lesions involving the hippocampal portions of the temporal lobes there is a loss of memory for the past life and inability to lay down new memory patterns, making new learning impossible and seriously impairing retention and recall of recent events.

"Diffuse brain damage causes marked changes of personality. There is a withdrawal into a narrow world of little mental activity and few social contacts. The brain-damaged individual has severe impairment of the ability to respond to rapid fluctuations or changes in the environment, or to respond to ideas or people, especially under pressure or stress."

In a special paper on post-traumatic psychoses related to head injury, appearing in 3B Attorneys' Textbook of Medicine, Gordy-Gray, its relationship to mental deficiency as a legal proposition is emphasized:

¶ 102.00, p. 102–1, in pertinent part:

"A psychosis is a gross loss of contact with reality. Psychosis is the medical equivalent of the word 'insanity.' A post-traumatic psychosis is a psychosis following, and 'related' to, injury.

"A psychosis can be 'related' to a head injury or, for that matter, to injury elsewhere in the body in one of the following ways: (1) the injury caused the psychosis; (2) the injury precipitated a psychosis out of an unstable personality; (3) the injury made overt a latent psychosis; (4) the injury aggravated pre-existing psychosis; and (5) the injury was not related to the subsequent psychosis."

¶ 102.20, p. 102–7, in pertinent part:

"In standard nomenclature the word 'psychosis' means 'insanity.' Thus, a traumatic psychosis means an insanity caused or precipitated by injury. However, it is not that simple. In the first place, there are psychoses, like schizophrenia, that are sometimes (though rarely) lighted up by an injury. In one sense this is still schizophrenia; but in another sense, it is a traumatic psychosis—because it was precipitated by trauma."

¶ 102.50, p. 102–12:

"The only two specifically traumatic, acute psychoses are delirium and the confabulatory (Korsakoff's) syndrome. Confabulation is the ready production of untrue statements and explanations."

¶ 102.51, p. 102–12:

"Occasionally, a patient develops a true delirium following a head injury. If there is no toxic factor (no alcohol or other drug), this may be considered a traumatic delirium. The usual picture of delirium is disorientation, restlessness, and hallucinosis, which is generally visual, occasionally auditory. Sometimes a patient exhibits a state of mild confusion in which he wanders around, talking and acting as if he knew what the score was,

but actually in a state of confusion. This, too, is a form of traumatic delirium."

¶ 102.52, pp. 102–12 through 102–13:

"Some patients invent answers to questions so that the replies have a glibness which would sound plausible, if the listener did not know the facts. The commonest example would be the patient who tells you that he was somewhere else yesterday, when actually he was in the hospital. This is the traditional pattern of 'Korsakoff's syndrome' which may occur in any type of traumatic delirium."

¶ 102.60, p. 102–13:

"Brain damage can lead to permanent personality changes, while sometimes brain damage triggers a latent psychosis. When this occurs, the record shows no overt psychotic reaction prior to the injury; and the injury either caused substantial brain tissue damage, or precipitated a serious emotional reaction in which brooding and impairment of self-image were factors.

"Brain damage makes it harder to solve problems. The way in which the patient meets that difficulty is based more on his own personality than on the extent of the damage. He might, for example, retreat into isolation. Or he might engage in a fury of overactivity to prove that he was all right, or to get away from considerations of his defect. The former would be a schizoid, the latter a manic kind of reaction. Chronic irritability is another common way of responding. This irritability applies to all stimuli: the patient is extraordinarily sensitive to light, alcohol, change in posture, noise, and so on. Irascibility, disinterest, apathy, memory defects, and mental deterioration are possible symptoms of chronic post-traumatic brain impairment. Antisocial behavior is a rare sequel to head injury in adults; it is less rare in children."

¶ 102.71, pp. 102–14 through 102–15:

"Since no one knows what causes schizophrenia, no one can assert categorically that any suggested cause is impossible. However, of the 300,000 schizophrenics in American hospitals today, only a minute proportion have ever had any head injury. Sometimes a schizophrenic episode follows immediately after a head injury. Before assuming that this is a cause-and-effect relationship, it is wise to consider the following:

"(1) Whether the patient's confusion or indifference could not have caused the accident, rather than *vice versa*.

"(2) Whether the current clinical picture could not be a toxic or organic psychosis resembling a schizophrenia.

"(3) Whether the unfortunately high frequency of both conditions does not, inevitably, bring some injuries and some schizophrenias to the same time and place through sheer coincidence.

"(4) Whether a deterioration which seems schizophrenic could not actually be gross brain degeneration of traumatic origin.

"(5) Whether a paranoid state in a patient does not lead to a distorted and misleading history."

¶ 102.72, p. 102–15, in pertinent part:

"Some authorities believe that a severe head injury may precipitate a manic-depressive attack. This has not been proved; but we do know that external factors may account for the onset of a psychotic episode.

"Any kind of injury might be such a precipitating factor, but to credit the injury for the particular attack is not to charge it with having caused the basic psychosis. Men have more head injuries but fewer manic-depressive attacks than women. If injury were a major factor, men would show a higher incidence of manic-depressive psychoses than women. Manics in their overactivity, may injure themselves; and depressed patients may precipitate injuries with suicidal intent. Thus, the injury may be the result of the psychotic episode, not the cause of it. Victims of manic-depressive psychoses usually retain their intellects unimpaired; that is, they do not deteriorate intellectually."

¶ 102.80, p. 102–17:

"A complete psychiatric study will include psychological tests—both personali-

ty studies and measurements of intelligence. Projection tests, like the Rorschach (a personality test which measures the emotional elements of the subject), give characteristic profiles for subjects who have had gross brain damage. Unfortunately, it is precisely in such a case that the additional psychological evidence is unnecessary, since there will be clinical evidence of the gross brain damage too. In experienced hands, however, these projection tests can often discriminate between apathy or confusion due to gross brain damage and similar symptoms due to schizophrenia.

"If a patient had had a personality study by a psychological test before the injury, and the test taken after the injury showed significant deterioration, then the finding would be valuable. However, few persons will have on record any such reports. Studies made after the accident may show an 'organic type' of profile. These profiles indicate trends and tendencies, and are not accurately diagnostic in the sense that a chemical laboratory test might be diagnostic. Thus, except in rather severe cases, the psychological profile cannot be used as good supportive evidence of the clinician's conclusion. Even if so used, contrary clinical finding will be given more weight.

"The examiner's diagnostic problem falls into three stages: (1) does the patient have a psychosis? (2) if so, how is it to be labelled? and (3) what relationship, if any, does it have to the prior injury?"

The point of all this is that a blow to the head causing unconsciousness creates a mental deficiency and is to be treated as any other mental deficiency. A pretrial examination by an unbiased medical expert is indicated, and that is the procedure which should have been followed in this case with all of its ramifications. The majority is presuming to act with greater expertise in a fact-finding function not proper for this court.

Persons with head injuries end up with a defective brain, just as surely as those who are born with one or who have brain injury because of disease or drugs or deterioration by reason of age. Psychiatrists have the capability of classifying those conditions and prescribing treatment.

## IV

Many of the cases cited by the majority came from California. In that state there is a special statute covering the defense of unconsciousness, amongst other classifications for which there may be no criminal responsibility. The California cases cited by the majority are valueless to a decision in this case because the California law is statutorily based on West's Ann. California Penal Code § 26:

"All persons are capable of committing crimes except those belonging to the following classes:

"One—Children under the age of fourteen, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness.

"Two—Idiots.

"Three—Lunatics and insane persons.

"Four—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent.

"*Five—Persons who committed the act charged without being conscious thereof.*

"Six—Persons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence.

"Seven—Married women (except for felonies) acting under the threats, command, or coercion of their husbands.

"Eight—Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (Emphasis added.)

California also has a special statute excepting voluntary intoxication from the defense

of unconsciousness. West's Ann. California Penal Code § 22:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

This is similar to Wyoming's § 6–1–116, W.S.1977.[6]

Wyoming did not adopt that part of the ALI Model Penal Code which would consider automatism as a separate defense: Section 2.01.

"(1) A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the

---

**6.** Section 6–1–116, W.S.1977:
"Drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness be occasioned by the fraud, contrivance or force of some other person or persons, for the purpose of causing the perpetuation [perpetration] of an offense, in which case the person or persons so causing said drunkenness for such malignant purpose, shall be considered principal or principals, and suffer the same punishment as would have been inflicted on the person or persons committing the offense, if he, she, or they had been possessed of sound reason and discretion. Where a crime rests in intention, the inebriated condition of the defendant at the time of committing the offense may be proven to the jury, as bearing upon the question of intention."

**7.** The majority also cites *People v. Grant*, 46 Ill.App.3d 125, 4 Ill.Dec. 696, 360 N.E.2d 809 (1977) to support the proposition that the distinction between automatism and insanity is made by case law. The result of that case is actually based upon Ill.Rev.Stat. 1973, Ch. 38, § 4–1:
"A material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing."
The committee comment under the Illinois statute states that this is derived from § 2.01(1) of the ALI Model Penal Code. Illinois has otherwise adopted the ALI Model Penal Code with

omission to perform an act of which he is physically capable.[7]

"(2) The following are not voluntary acts within the meaning of this Section:

"(a) a reflex or convulsion;

"(b) a bodily movement during unconsciousness or sleep;

"(c) conduct during hypnosis or resulting from hypnotic suggestion;

"(d) a bodily movement that otherwise is not a product of the effort or determination of the actor, either conscious or habitual.

\*     \*     \*     \*     \*     \* "

Wyoming adopted language which embraced the alternative suggested in the comments to § 2.01, supra:

"Any definition must exclude a reflex or convulsion. The case of unconsciousness is equally clear when unconsciousness implies collapse or coma, as perhaps it does in ordinary usage of the term. There

respect to mental disease or defect. Ill.Rev. Stat. 1973, Ch. 38, § 6–2. It should also be noted that this was not a brain damage case and the defendant had entered a plea of mental disease and defect. There were no pretrial procedural problems involved or mentioned in the opinion. Ill.Rev.Stat. 1973, Ch. 38, § 115–6 requires notice that such defense will be relied on. Wyoming, as pointed out later, did not elect this alternative.

Following a new trial, after remand so that the jury could be instructed on both an insanity defense and on the defense of involuntary conduct, in *People v. Grant*, 71 Ill.2d 551, 17 Ill. Dec. 814, 377 N.E.2d 4 (1978), it was developed that the defendant was an epileptic subject to both grand mal and psychomotor seizures and defendant's expert, the only expert to testify, rendered an opinion that defendant was experiencing a psychomotor seizure at the time of the offense. The court held it was not error to instruct only on the insanity defense, identical to § 7–11–304(a), W.S.1977, supra, stating:
"\* \* \* A cornerstone of the defense of involuntary conduct is that a person, in a state of automatism, who lacks the volition to control or prevent his conduct, cannot be criminally responsible for such involuntary acts. Similarly, the insanity defense exculpates a person whose volition is so impaired during a state of automatism that he is substantially incapable of conforming his conduct to the law. \* \* \* "

are, however, states of physical activity where self-awareness is grossly impaired or even absent, as in epileptic fugue, amnesia, extreme confusion and equivalent conditions. [Citations.] How far these active states of automatism should be assimilated to coma for this legal purpose presents a difficult issue.

"There is judicial authority supporting the assimilation. [Citations.] *An alternative approach, however, is to view these cases as appropriate for exculpation on the ground of mental disease or defect excluding responsibility. This view has also had support in the decisions.* ·[Citations.] It offers the advantage that it may facilitate commitment when the individual is dangerous to the community because the condition is recurrent. By the same token, however, it bears more harshly on the individual whose condition is non-recurrent, as in the case where an extraordinary reaction follows the administration of a therapeutic drug. And there may be a difficulty in regarding some of these conditions as 'mental disease or defect,' within the meaning of section 4.01 of the draft or as 'insanity' under prevailing law, although cognition is sufficiently impaired to satisfy that aspect of the test." (Emphasis added.)

The Wyoming legislature clearly defined "mental deficiency" to unquestionably include appellant's alleged condition (brain damage). The ALI Model Penal Code does not undertake to define "mental deficiency" or "mental illness." The Wyoming definition does in the case before us make it easy to apply the test of mental responsibility, § 7–11–304(a), supra. We do not have the problem with the alternate course because there is present a true "mental disease or defect" (brain damage) expressly provided for, required to be handled in accordance with the procedures set out in §§ 7–11–301 through 7–11–306, supra. The aid of experts in psychiatry is imperative not only for the defendant's protection but for that of the State representing the public, as well.

## V

We should examine the cases cited by the majority. The result is revealing. Since the majority seems to rely most heavily on *State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348 (1975), it should first be analyzed. The defendant there did *enter a plea of not guilty and not guilty by reason of insanity and was committed for examination prior to trial to determine if he was capable of standing trial.* The state hospital psychiatrist diagnosed him as not insane and concluded that he had a personality disorder, which according to his testimony some people would interpret as meaning the defendant was just "mean." The psychiatrist further testified that the defendant " 'on occasion seeks to * * * present himself as mentally not responsible * * * in order to escape the consequences of his behavior.' " As a matter of fact he did so during the trial rolling his eyes and going through idiotic behavior, his testimony being an "incoherent jumble" to convey the impression that he was mentally deranged.

There were no questions raised in that case similar to the one here, as to whether evidence of a mental condition is admissible or not admissible because of failure to plead and submit to examination. The conviction of Caddell was affirmed because there was no evidence of unconsciousness. The only reason I can see that the North Carolina court even went into the question was to reverse the holding of a previous case which held that the defendant does not have the burden of proving unconsciousness. (*State v. Mercer*, 275 N.C. 108, 117, 165 S.E.2d 328, 335 (1969), also cited by the majority.) Its rule is now that the defendant has the burden of establishing the defense of unconsciousness because in North Carolina the defenses of insanity and unconsciousness are considered akin:

" * * * We are unable to perceive a reasonable basis for distinction, in this respect, between *insanity* and *intoxication* on the one hand and *unconsciousness* from a different cause, on the other. In all three defenses the contention is the same—the defendant did the act, but should not be convicted because the req-

uisite mental element was not present. The same presumption, which casts upon the defendant, claiming insanity, the burden of proving it to the satisfaction of the jury, and thus to negative the presence of *mens rea*, applies also to the defendant who asserts a temporary mental lapse due to concussion, somnolentia, epilepsy or the like." *Id.*, 287 N.C. at 289, 215 S.E.2d at 363. (Emphasis in original.)

Further examination of the law of North Carolina reveals that the state has not adopted the Model Penal Code provisions pertaining to mental responsibility which is the case in Wyoming.[8] Insanity in North Carolina is a judicially defined defense, as was the case in Wyoming prior to adoption of our present statutory scheme of defining the criteria of metal irresponsibility. Sections 7–11–301 through 7–11–306, W.S. 1977 (Ch. 191, S.L.Wyo. 1975).[9] However, that state did in 1973 adopt a statutory provision requiring notice if a defendant is to raise a defense of insanity or introduce expert testimony relating to mental defect:

"(a) If a defendant intends to raise the defense of insanity, he must within the time provided for the filing of pretrial motions under G.S. 15A–952 file a notice of his intention to rely on the defense of insanity. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make other appropriate orders.

"(b) *If a defendant intends to introduce expert testimony relating to a mental disease, defect, or other condition bearing upon the issue of whether he had the mental state required for the offense charged*, he must within the time provided for the filing of pretrial motions under G.S. 15A–952(b) file a notice of that intention. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make other appropriate orders.

"(c) * * * "[10] (Emphasis added.) Section 15A–959, General Statutes of North Carolina.

The court in *Caddell* did not have that question before it because the defendant had entered a plea of insanity and had been examined by the state, nor did the defendant claim or have brain damage. However, later in North Carolina, it was held that defendants must do so in order to utilize the defense. *State v. Grainger*, 29 N.C.App. 694, 225 S.E.2d 595 (1976). That is my only concern in the case before us.

A careful examination of the majority quotation from *State v. Caddell*, supra, along with the foregoing discussion, discloses its inapplicability:

" 'The defenses of insanity and unconsciousness are not the same in nature, for unconsciousness at the time of the alleged criminal act *need not be the result of a disease or defect of the mind*. As a consequence, the two defenses are not the same in effect, for a defendant *found not guilty by reason of unconsciousness*, as distinct from insanity, is not subject to commitment to a hospital for the mentally ill.' *State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348, 360 (1975)." (Emphasis added.)

---

8. See § 4.01, ALI Model Penal Code:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

Compare with § 7–11–304(a), W.S.1977, infra.

9. The bifurcated trial provided by that act, § 7–11–305(a), was held unconstitutional by this court. *Sanchez v. State*, Wyo., 567 P.2d 270 (1977). The section has been amended to delete the offensive parts. Section 1, Ch. 3, S.L.Wyo. 1978. The bifurcated trial was never a part of the Model Penal Code.

10. Compare with § 7–11–304(c), W.S.1977, requiring a plea of "not guilty by reason of mental illness or deficiency." This serves the important function of notice to the State, in order that the State may assume its burden after defendant's evidence of furnishing qualified evidence in rebuttal.

In the case before us, appellant claims a blow on the head caused damage to the brain. Since the brain houses the mind, there, therefore, is a claimed defect of the mind.[11] The appellant before us did not have a healthy mind as indicated by the majority but alleged and attempted to prove he possessed a damaged one.

Having been chairman of the committee which drafted the W.P.J.I.Cr., I, as well as the majority, hold that group in high esteem. We simply do not have a case before us to decide whether or not the instruction is valid. Instruction 4.301 has no authoritative support nor does it purport to cite any for application to the case now before the court in that it applies only to persons of sound mind. The appellant as previously noted did not have a sound mind in that, if his allegations were true and his expert testimony accepted, he was functioning with a damaged brain. I would say that the last paragraph of the comment to the pattern jury instruction excludes its use in the case before us:

> "The second paragraph of the instruction limits the availability of the unconsciousness defense to persons of sound mind. *People who commit similar acts but are of unsound mind are suffering from mental illness or deficiency and are covered by the laws and instructions concerning the insanity defense.*" (Emphasis added.)

Now I review the other cases cited by the majority. While I consider the California cases of no value because of the controlling statute, it is observed that the cases cited by the majority do not include any head injury situations. In *People v. Hardy*, 33 Cal.2d 52, 198 P.2d 865 (1948), the loss of memory and consciousness was claimed as due to shock when the victim of her crime (murder) attempted a sexual assault. In *People v. Martin*, 87 Cal.App.2d 581, 197 P.2d 379 (1948), the defendant *did enter a plea of not guilty by reason of insanity* and claimed the unconsciousness was due to the insanity. The conviction was affirmed. *People v. Taylor*, 31 Cal.App.2d 723, 88 P.2d 942 (1939) is an alcohol intoxication case; the conviction was affirmed. In *People v. Conley*, 49 Cal.Rptr. 815, 64 Cal.2d 310, 411 P.2d 911 (1966), cited by the majority, the trial court did instruct the jury on unconsciousness under the California statute, but the case was reversed on other grounds. Inasmuch as reversal was required and similar issues would be raised on retrial, the Supreme Court of California pointed out that the defendant offered evidence of intoxication to support his defense of unconsciousness. The trial court in its unconsciousness instruction had made no reference to intoxication. The court held: "An instruction that does not distinguish unconsciousness caused by voluntary intoxication from that induced by other causes is erroneous," the court pointing out that unconsciousness caused by voluntary intoxication is not a defense falling under California's unconsciousness statute but governed by separate legislation. I point this out in another part of this opinion.

*People v. Methever*, 132 Cal. 326, 64 P. 481 (1901), (not cited by the majority) is a murder case in which the defendant relied on both insanity arising from head wounds during his life and lack of consciousness due to delirium tremens [12], but was refused an

---

11. 3A Attorneys' Textbook of Medicine, Gordy-Gray, ¶ 83.03, p. 83–3 in pertinent part:

> "The question of the nature of the psyche or 'mind' is so far an insoluble one. However, the psyche cannot exist without the physical brain and its neuronal circuits, at least in any form which we can at present perceive. It expresses itself through the neuronal mechanisms of the brain. These we can test and investigate. Modern neurophysiological and neurochemical investigations have given us a great deal of valuable information for the elucidation of these neuronal mechanisms for

expression of the higher level functions of the brain."

12. Disapproved as to the drunkenness (delirium tremens) phase only, in *People v. Gorshen*, 51 Cal.2d 716, 336 P.2d 492 (1959). At 336 P.2d 500, the court said:

> " * * * More enlightening is the judicial recognition (in *People v. Baker* (1954), supra, 42 Cal.2d 550, 568, 569 [9, 11, 12], 268 P.2d 705) that ' "Sound mind" and "legal sanity" are not synonymous. * * * "Soundness" of mind is defined as "free from flaw, defect or decay, perfect of the kind; undamaged or

instruction on the latter. The supreme court affirmed the conviction saying:

" * * * and the court is entirely convinced that subdivision 5, § 26 [of the California Penal Code, supra], does not contemplate cases of unsound mind,—that is, cases of idiots, lunatics, and insane persons,—but, upon the contrary, only contemplates cases of persons of sound mind, as, for example, somnambulists, or persons suffering with delirium from fever or drugs. * * * " (Bracketed words added.)

The thrust is that evidence of head trauma and delirium tremens can go, as a matter of law, only to establish that the defendant was of "unsound" rather than "sound" mind. This concept was also approved in *People v. Hardy*, supra, 198 P.2d at 865, 873. It makes sense that a damaged brain contains an unsound mind.[13]

As far as amnesia caused by a blow on the head (which appellant also claims as a result of the blow) is concerned and as covered by Anno., Amnesia as affecting capacity to commit crime or stand trial, 46 A.L.R.3d 544, § 2, pp. 547–548, it is said:

"It is axiomatic in the criminal law that legal mental capacity to commit a crime is an essential condition of criminal responsibility. Nevertheless, all of the cases in this annotation, directly or indirectly concerned with the issue, either expressly or by necessary implication support the general rule that amnesia *per se is not a defense to crime unless it is also*

shown that the accused, at the time of the allegedly wrongful act, did not know the nature of the act and that the act was wrong. One court stated in this regard that amnesia does not absolve or exculpate a defendant from any of his criminal acts or from total criminal responsibility since amnesia which occurs after a crime can have no effect on a defendant's motives or conduct or behavior at the time of the crime. Another court, while recognizing that amnesia may lead to crimes entirely unknown to the culprit at a later date, said that such a situation is rare, and that more frequently a defendant, remembering full well what he has done, alleges amnesia as a false defense, and that in such cases to prove his innocence or guilt may be most difficult.

"While amnesia per se has been universally held not admissible to prove innocence or guilt of a crime, it has been considered a circumstance which the judge and jury may consider in determining the penalty for a crime." (Emphasis added and footnotes omitted.)

The defendant claiming amnesia particularly needs pretrial examination to protect not only society, represented by the State, but also himself. 46 A.L.R.3d 544, § 4.

*Carter v. State*, Okl.Cr., 376 P.2d 351 (1962) is cited by the majority, fn. 5. There the defendant asserted that he was suffering from a head injury received in an auto-train wreck in 1959, and a car-truck accident in 1960, resulting in chronic brain syndrome so that he was subject to blackouts

13. Before leaving the California statutory approach, I would also like to call attention to *People v. Wilson*, 66 Cal.2d 749, 59 Cal.Rptr. 156, 427 P.2d 820 (1967), not cited by the majority, though appearing in the Pattern Jury Instruction comment. It is an example of the abuses we may expect. There a claim of unconsciousness was made in that the defendant was "distraught" and "mentally exacerbated," due to extreme anger, terror and aggravation and jealously over the conduct of his divorced wife causing him to kill her and a boyfriend and wound another. The court reversed on the ground that an instruction on unconsciousness should have been given because the defendant claimed that caused him to be unconscious! I entertain little doubt we also will be confronted with such oddities.

unimpaired; healthy, not diseased or *injured*, robust—said of body or mind." (Webster's New Internat. Dict., p. 2403.) * * * If the defendant has a "sound mind," that is, "a healthy and robust mind, *neither diseased nor injured*," it necessarily follows that he would not have a mental infirmity making him incapable of premeditating or deliberating. * * * Although moronity and the mental condition caused by epileptic seizures, unless they amount to unconsciousness, are not included within the exempting provisions of section 26 of the Penal Code [lack of criminal capacity], nevertheless these conditions may indicate some lack of a "healthy and robust mind" and do have bearing on the question of the capacity to premeditate and deliberate.' ". (Emphasis added.)

and had just been released to the custody of his mother. The State asserted he was drunk when causing the death of another in a vehicular manslaughter case. The trial court excluded the evidence of his head injury and effect because no plea of insanity had been entered. The Oklahoma Court of Criminal Appeals said that the evidence was admissible under a statute similar to that of California, 21 O.S. 1951, § 152, reading in part:

"All persons are capable of committing crimes, except those belonging to the following classes:

* * * * * *

"6. Persons who committed the act charged without being conscious thereof."

As explained before, Wyoming has no such statute for the reasons stated.

*Watkins v. People*, 158 Colo. 485, 408 P.2d 425 (1965) cited by the majority, fn. 5, involved unconsciousness caused by a blow on the head. The defendant claimed traumatic amnesia by reason of being hit on the head with a blackjack rendering him incapable of forming criminal intent. The court held that since the defendant got it in a fracas wherein he killed another, it was not a defense to first degree murder, when the defendant precipitated the fight. I do not disagree with the holding but question the pertinence of the case.

The majority opinion cites *Fain v. Commonwealth*, 78 Ky. 183, 39 Am.Rep. 213 (1879), fn. 5. The case concerns sleep-walking (somnambulism). I would question that under current advanced medical knowledge that sleep-walking is not a mental deficiency, 3A Attorneys' Textbook of Medicine, ¶ 83.53, pp. 83–21 through 83–22:

"Sleep-walking or somnambulism is a form of complex behavior (automatism) which occurs while an individual is 'asleep.' He is unaware of his actions during the attack and does not remember

them afterwards when he awakes. Most authors believe that the somnambulistic attack is a psychogenic disorder, i.e., psychogenically determined like the neuroses. Sleep-walking is not the same as the 'automatism' of the patient in an attack of psychomotor epilepsy."

So does Kentucky in a case subsequent to *Fain v. Commonwealth*. In *Tibbs v. Commonwealth*, 138 Ky. 558, 567, 128 S.W. 871, 874 (1910), that court said:

"Complaint is made of the fact that the court submitted to the jury the question of appellant's insanity. Some evidence was admitted on the trial tending to show that appellant was a somnambulist, and while in this state was without self-control, and committed acts of which he had no recollection. We fail to see how these facts would constitute any defense other than that embraced in a plea of insanity. Certainly the appellant cannot complain that he was given the benefit of such defense." [14]

In fn. 5 the majority cites *Lewis v. State*, 196 Ga. 755, 27 S.E.2d 659 (1943). The defense in that case was that the defendant claimed he was apparently asleep when he killed the deceased. However, it developed that the defendant's excuse was that he fell asleep after drinking a pint of whiskey. He was not permitted to get away with it, the court holding voluntary intoxication was no excuse. The court's comment is interesting:

" * * * We recognize the rule of law that authorizes all reasonable deductions from proved facts; but we think that to find, under the evidence in this case, an insane mental condition of the defendant, known as sleep-walking or somnambulism would be to leave the realm of reasonable deduction and move out into a field of speculation and conjecture without the support of any concrete fact. * * *"

This may be a good point at which to discuss the majority's reference to LaFave

---

14. A further Kentucky case cited by the majority, fn. 5, is *Smith v. Commonwealth*, Ky., 268 S.W.2d 937 (1954). There, the court reversed because the trial court had not properly instructed the jury on the fact that a person with a history of blackouts, cannot claim the defense of unconsciousness in a vehicular homicide case because that amounts to a willful indifference to the safety of others and not the act of a prudent man. It is not a concussion case, nor is there any indication that Kentucky has any statutory controls such as Wyoming.

and Scott. In their Hornbook on Criminal Law (1972) § 44, pp. 337–341, they point out that the cases on the subject of automatism "are few in number." The defense, in the few places which recognize it, is somewhat on the side of bizarre and has not been welcomed by the courts in many jurisdictions but has been a fertile subject for the academia.[15] It is opined by the authors that its reception has been less than exciting because if successful, the defendant obtains an outright acquittal and need not undergo the risk of commitment even though a dangerous individual. LaFave and Scott explain that it is for this reason that courts for the most part have taken the insanity or mental defect route as a matter of policy and the defense has not been popularly received. The majority here has permitted itself to be trapped into a most controversial defense, which the legislature sought to avoid by a careful definition of mental deficiency to include "brain damage."

## VI

There is no basis whatsoever that supports the proposition the majority espouses

that, "It does not seem that the definition of mental deficiency in § 7–11–301(a)(iii), W.S.1977, which includes 'brain damage,' encompasses simple brain trauma with no permanent aftereffects. It is our view that the 'brain damage' contemplated in the statute is some serious and irreversible condition having an impact upon the ability of the person to function." To the contrary, the only material condition is that which exists at the moment of the crime. How long should the condition exist before it comes within the cloak of the statute—a minute, an hour, a day, a week, two weeks, a month, a year, five years, a lifetime? The statute says nothing about a temporary condition or one that is "serious and irreversible." When the language of the statute is clear and unambiguous, there is no room for construction and a court has no right to look for and impose another meaning. *Hayes v. State*, Wyo., 599 P.2d 558, 564 (1979).

In the first place, we do not know the full extent of the appellant's brain damage. The majority takes a big leap when they

**15.** An excellent discussion of the subject appears in 63 Columbia Law Review 645, Physical Disorder, Consciousness, and Criminal Liability, by Sanford J. Fox (1963). There, it is explained why the courts have not been quick to adopt or promote the automatism defense. He concludes:

"It has been seen that attempts to distinguish the automatism, or 'unconsciousness,' defense from the insanity defense are difficult, and no satisfactory solution has yet been suggested. On the premise that penal sanctions are to be applied only to those with an acknowledged capacity for choice, it is obvious that much the same rationale behind the insanity defense applies to persons whose bodily disorders impel them to cause criminal harm. One is hard pressed, in fact, to find the considerations that separate the automatism defense from the insanity defense. * * *

\* \* \* \* \* \*

"Whether there is a rational basis for the automatism defense at all constitutes the most fundamental problem. Certainly there is no clear historical basis for it. The question is unduly difficult by virtue of the black and white choices involved—criminality, insanity, or acquittal. Perhaps here is an apt place to consider the applicability of the par-

tial responsibility concept, whereby involuntary medical treatment would be the consequence of adjudicating automatism, sane *or* insane. Whether to use in-patient or out-patient facilities could turn on the singularities of each case, avoiding the fallacy of treating diseases instead of people. On the other hand, here it is also apt to invoke comprehensive pre-trial procedures that could avoid the disadvantages to all parties of a criminal trial while at the same time permitting fructification in the medical treatment that promotes all interests.

"In any event, the whole problem is badly in need of informed legislative consideration, for case law developments indicate strongly that a properly planned legal order for dealing with automatism problems is beyond the creative capacity of any court." (Footnote omitted.)

Wyoming has legislatively solved the problem. It does not legislatively recognize the automatism defense. It does recognize "brain damage" as a mental deficiency. It does not compel commitment as a result of a finding of mental illness or deficiency and takes the position that such disposition will be taken as is necessary under the alternatives provided by § 7–11–306(a), (b), (c), and (d), discussed infra.

say, "The commitment of an automatistic individual to a mental institution for rehabilitation has absolutely no value. Mental hospitals generally treat people with psychiatric or psychological problems. This form of treatment is not suited to unconscious behavior resulting from a bump on the head." That is pure conjecture, unsupported by any authority whatsoever:

"Brain injury is most simply evaluated by length of unconsciousness. If less than 15 minutes, consideration might be postponed 6 months before venturing an opinion about the future. After that date, in the absence of findings indicative of derangement within the nervous system, such history may be disregarded.

"Unconsciousness longer than 15 minutes is of major significance. A high degree of disability is probable during the first year with unconsciousness between 15 minutes and 6 hours. During the second year, about 150% of normal mortality is to be anticipated in the future. Thereafter, in the absence of any symptoms of permanent brain damage, this factor may be disregarded.

"Unconsciousness longer than 6 hours, and history of hemorrhage or operation present even more serious futures. Evaluation should be postponed one year. During the second, experience indicates about 180% of future mortality, approximately 150% in the third, 125% in the next 2 years, and not until longer than 5 years after injury may this factor be disregarded. If there are any symptoms of derangement of the nervous system meanwhile, they may be expected to continue into the future, and indefinitely if present at the time of examination." 4 Attorneys' Textbook of Medicine, Gordy-Gray, ¶ 180.33, p. 180–65.

It is not up to us to evaluate this individual or any other with a head injury. That is a matter for the trial judge. We must realize that the individual defendant who pleads mental deficiency is only interested in mental deficiency at the time of the commission of the offense, as was the appellant here. He then, if acquitted for that reason, prepares to meet the next challenge of whether he will be committed.

The defendant's position was that his unconscious condition, caused by brain injury, was temporary and was an injury which would heal. The Wyoming statutes contemplate temporary mental defect or deficiency. One of the purposes of the required pretrial commitment and examination is to determine the nature of the claimed defect or deficiency and the period covered by the alleged disability:

"(c) Written reports of the pretrial examination shall be filed with the clerk of court. The report shall include:

"(i) Detailed findings;

"(ii) An opinion as to whether the accused has a mental illness or deficiency, and its probable duration;

"(iii) An opinion as to whether the accused, as a result of mental illness or deficiency, lacks capacity to comprehend his position, to understand the nature and object of the proceedings against him, to conduct his defense in a rational manner, and to cooperate with his counsel to the end that any available defense may be interposed;

"(iv) An opinion as to whether *at the time of the alleged criminal conduct* the accused, as a result of mental illness or deficiency, lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law;

\*     \*     \*     \*     \*     \*

"(h) A finding by the court that the accused is mentally fit to proceed shall not prejudice the accused in a defense to the crime charged on the ground *that at the time of the act he was afflicted with a mental illness or deficiency excluding responsibility.* \* \* \* " (Emphasis added.) Section 7–11–303, W.S.1977.

This same concept, a temporary condition, appears in the legislation recognizing the defense. Section 7–11–304(a), W.S.1977:

"(a) A person is not responsible for criminal conduct *if at the time of the criminal conduct, as a result of mental illness or deficiency, he lacked substantial capacity*

either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

Holding that this court's ruling is on the facts of this case is not a safety valve because the majority has reached that point through an analogy which approves the other facets of automatism. If the court ignores "brain damage" in this case, it has charted a course for all brain damage cases.

## VII

The majority makes a loose statement without any basis in Wyoming law: "However, in the case of a finding of not guilty by reason of insanity, the defendant is ordinarily committed to a mental institution." LaFave and Scott is then cited which concludes that "a finding of not guilty by reason of insanity [is] followed by commitment rather than a mere finding of not guilty followed by release * * *." (Bracketed word supplied.) Neither the majority nor LaFave and Scott states the law as it is in this state.

A judgment of not guilty by reason of mental deficiency does not mean an automatic commitment to the Wyoming State Hospital. The trial judge has the alternatives of discharge from custody, § 7–11–306(b) [16], an order of release of subject to

16. Section 7–11–306(b), W.S.1977:
    "(b) If the court finds that the person is no longer affected by mental illness or deficiency, or that he no longer presents a substantial risk of danger to himself or others and is not in need of care, supervision or treatment, the court shall order him discharged from custody."

17. Section 7–11–306(c), W.S.1977:
    "(c) If the court finds that the person is affected by mental illness or deficiency and presents a substantial risk of danger to himself or others, but can be controlled adequately and given proper care, supervision and treatment if released on supervision, the court shall order him released subject to such supervisory orders of the court as are appropriate in the interests of justice and the welfare of the defendant. The court may appoint any person or state, county or local agency which the court considers capable of supervising the person upon release. Upon receipt of an order issued under this subsection, the person or agency appointed shall

supervision and treatment, § 7–11–306(c) [17] or an order of commitment, § 7–11–306(d) [18]. Other provisions for the protection of the one committed and the public are contained in § 7–11–306(e) through (h).

The defense of insanity, under the previous law of this state and now enlarged mental illness or deficiency, has been and is much abused. In an interesting Comment, Competency to Stand Trial and the Insanity Defense in Wyoming—Some Problems, Craig Newman, X Land & Water L.Rev., 239–240 (1975), it is observed:

" * * * In Wyoming only 2 of 102 defendants who pleaded not guilty by reason of insanity in a two year period were found by the state hospital to be insane at the time of the crime. These two defendants were not tried; rather they were transferred to mental hospitals in other states. Only 74 of 102 were tried; and only one of the defendants was acquitted by reason of insanity."

The court has now added a new defense of ethereal proportions which will be likewise the subject of much abuse.

## VIII

The majority cites an English case, *Hill v. Baxter*, 1 All E.R. 193, 1 QB 277 (1958). LaFave and Scott, § 44, pp. 339–341, does

assume the supervision of the person pursuant to the direction of the court. Conditions of release in such orders may be modified from time to time and supervision may be terminated by order of the court. If upon a hearing the state shows by a preponderance of the evidence that the person released on supervision under this subsection can no longer be controlled adequately by supervision, the court may order the person committed to the Wyoming state hospital or other designated facility for custody, care and treatment."

18. Section 7–11–306(d), W.S.1977:
    "(d) If the court finds that the person is affected by mental illness or deficiency and presents substantial risk of danger to himself or others and that he is not a proper subject for release or supervision, the court shall order him committed to the Wyoming state hospital or other designated facility for custody, care and treatment."

an excellent job of reviewing the tragic application of the rule of automatism in that country reflecting its dangers, the judicial aftermath and a whole new concept apparently now dealing with it as a mental deficiency:

"The experience in Britain, where the automatism defense has been raised with much greater frequency, is instructive. There are three cases which are worthy of brief note here: *Regina v. Charlson* [1 All E.R. 859 (1955)]; *Regina v. Kemp* [3 All E.R. 249 (1956)]; and *Bratty v. Attorney-General for Northern Ireland* [3 All E.R. 535 (1961)].

"Charlson, who struck his ten-year-old son with a mallet and then threw him out of a window, was charged with (1) causing grievous bodily harm with intent to murder; (2) causing grievous bodily harm with intent to cause such harm; and (3) causing grievous bodily harm (a strict-liability offense). There was evidence that Charlson had a cerebral tumor, because of which he would be subject to outbursts of impulsive violence over which he would have no control. He did not plead insanity, and testimony was offered that he was not suffering from any mental disease. Charlson was acquitted of all three charges by a jury which had been instructed in part as follows: " 'No specific intention need be proved by the prosecution before the accused can be found guilty of the third charge * * *. You must, however, be satisfied that he was acting consciously * * *. Therefore, in considering this third charge you have to ask yourself "was the accused knowingly striking his son, or was he acting as an automaton without any control or knowledge of the act which he was committing?" * * * If you are left in doubt about the matter, and you think he might well have been acting as an automaton without any real knowledge of what he was doing, then the proper verdict would be not guilty, even on the third and least serious of these alternatives.'

"The commentators have uniformly expressed concern over the result in *Charlson*. As one writer put it, 'it is difficult to accept with equanimity a state of the criminal law in which it is more than possible, it is proper, to set free someone who on his own showing is likely to be suffering from a condition which may make him repeat an irrational and savage attack on a child with whose welfare he is entrusted by law.' A similar concern appears to have influenced the judge in *Kemp*, where the defendant was charged with causing grievous bodily harm to his wife by striking her with a hammer. It was agreed that Kemp was suffering from arteriosclerosis and had not known what he was doing at the time. One doctor, called by the prosecution, gave as his opinion that this was due to melancholia, a disease of the mind induced by the arteriosclerosis. Two other doctors, one called by the defense and one by the prosecution, testified that the defendant's condition did not constitute a disease of the mind.

"Although it was Kemp's position that he was entitled to outright acquittal on the basis of *Charlson*, the trial court instructed only on insanity on the ground that the facts of the case fit within *M'Naghten* whether one accepted the evidence of the prosecution or defense: 'The hardening of the arteries is a disease which is shown on the evidence to be capable of affecting the mind in such a way as to cause a defect, temporarily or permanently, of its reasoning and understanding, and is thus a disease of the mind within the meaning of the rule.' Most significant, the court made it apparent that this conclusion was not based upon any medical definition of the term 'mental disease or defect' but rather upon the policy 'that people who committed crimes of violence, *even though they were not responsible* for their actions, ought not to be allowed to go free because they might commit an act of violence again.'

"In *Kemp*, unlike *Charlson*, there was at least some expert testimony of mental disease, but it is generally agreed that the two cases may not be reconciled on this basis. It was noted, for example,

that both cases 'involved organic interference, and that it 'is difficult to understand why arteriosclerosis can be said to affect the powers of "reasoning, understanding, and so on," when a cerebral tumor cannot.' *Kemp* was viewed as a way of 'meeting what has been accepted as a defect in the law,' namely, an avenue of outright release for dangerous defendants.

"The matter reached the House of Lords in the *Bratty* case, an appeal from a conviction in a murder case in which both automatism and insanity were raised as defenses. The only evidence on both defenses was Bratty's testimony that he 'had some terrible feeling and then a sort of blackness' before the killing, and expert testimony that he was suffering from psychomotor epilepsy at the time he strangled his victim. The trial judge refused to instruct on automatism, and the insanity defense was rejected by the jury. The House of Lords upheld the conviction, explaining that the defendant's own testimony had not provided a basis for an automatism instruction because there was no medical evidence to support the claim of blackout, and that the evidence of psychomotor epilepsy did not provide a basis because the doctors who testified 'agreed that psychomotor epilepsy * * * is a defect of reason due to disease of the mind.' As stated by Lord Kilmuir, 'where the only cause alleged for the unconsciousness is a defect of reason from disease of the mind, and that cause is rejected by the jury, there can be no room for the alternative defense of automatism.'

"Lord Denning's opinion in *Bratty* has received more attention. He noted that the question of whether the evidence concerning the cause of the defective consciousness establishes a disease of the mind is a policy matter to be decided by the courts rather than the medical experts. As to the policy, he stated: 'It seems to me that any mental disorder which has manifested itself in violence and is prone to recur is a disease of the mind. At any rate it is the sort of disease for which a person should be detained in hospital rather than be given an unqualified acquittal.' Lord Denning, therefore, quite frankly acknowledged that the need for protective custody of the defendant is a major consideration in determining whether the defendant has an automatism-disease or an insanity-disease.

"While *Kemp* and *Bratty* have received a sympathetic reception on the ground that it is desirable to avoid the result reached in *Charlson*, it has been questioned whether 'the broadening of the definition of the phrase "disease of the mind" may not be a cure worse than the ill it is intended to remedy.' By this extension of the insanity defense into an area which might otherwise be occupied by the defense of automatism, medical experts are 'forced into the position of making statements in court they would not make in the clinic,' while a defendant who 'has acted unconsciously due to a physical or organic disorder [is] faced with a verdict of insanity and committal' to an institution intended only for the treatment of mental illness. It has been suggested that it would be preferable if provision were made whereby one who interposed a successful automatism defense could be detained or conditionally discharged for the purpose of his receiving the surgical or medical treatment which might be necessary to prevent a recurrence of the unconsciousness." (Footnotes omitted and bracketed citations added.)

With respect to the last sentence of the quote, treating brain damage as a mental deficiency, I agree. Such gives the court in Wyoming the authority to commit or release as required to meet the circumstances of each case.

I conclude that the majority opinion has no authoritative basis whatsoever; not a single case or reference cited supports their position. I would have affirmed the district court [19], but would not have created the

19. I agree that the evidence does not establish that the appellant was unconscious and that his defense was feigned.

new defense of unconsciousness, at least as to traumatic automatism (brain damage) clearly included as a mental deficiency by § 7–11–301(a)(iii), supra. There is no need for the court to go beyond the point. I can safely predict that defendants will disregard the plea of "not guilty by reason of mental illness or deficiency" and claim unconsciousness for many mental diseases and deficiencies which include that symptom.

ROONEY, Justice, specially concurring.

In his specially concurring opinion (in which I join), Justice Raper has pointed out the inappropriate application to this matter of *every* case cited by the majority in their opinion. Among other things, he has indicated (1) the failure of the majority opinion to recognize the plain words used by the legislature, (2) to distinguish between those words and "insanity," and (3) the potential injury to both the defendant and the public which will arise from failure to afford court-ordered examination of those offering an "unconscious" defense under a plea of not guilty.

In this separate special concurrence, I want to emphasize a dangerous result of the majority opinion: the probable inclusion of the defense of "unconsciousness" on almost every plea of "not guilty." I believe we are regressing to the situation reflected in the quotation set forth in Justice Raper's opinion from *Jessner v. State,* 202 Wis. 184, 231 N.W. 634, 71 A.L.R. 1005 (1930), concerning the situation which existed before mandatory court ordered examinations were required of those who based their defense on absence of mental responsibility:

"The assault thus made upon this statute is highly important. Its enactment was in response to a well-settled conviction that, in criminal cases at least, where the interests of society were involved, there should be some technical evidence from unprejudiced and reliable sources. This conviction grew out of the belief that under the then existing procedure there was a striking tendency on the part of experts to accommodate their opinions to the necessities of that side of the case upon which they were testifying, and that such opinions were to a very large extent prejudicial and unreliable. To secure the reliable and unprejudiced opinions of the ablest experts in such cases, to the end that the purest degree of justice might be promoted, the board of circuit judges sponsored the enactment of this statute. If this statute must be condemned as unconstitutional, it will require retracement of most significant forward steps in judicial procedure, and bring regret to all who believe in steady progress towards the attainment of a more perfect justice."